Scott **SORNBERGER** and Teresa Sornberger, individually and on behalf of her children, Claude Shinall and Kayla Bowden, Plaintiffs,

v.

**FIRST MIDWEST BANK**, City of Knoxville, City of Galesburg, Rick Pesci, Dennis Sheppard, Anthony Riley, and David Clauge, Defendants.

No. 02–1224.

United States District Court,
C.D. Illinois.

Dec. 9, 2002.

granting the defendant a new trial on Count Two." (Gov't Supp. Mem. Re: Interstate Commerce, at 4.)

Jon Loevy, Arthur Loevy, Jon Rosenblatt, Michael Kanovitz, Loevy & Loevy, Chicago, IL, for Plaintiffs.

Marcos Reilly, Hinshaw & Culbertson, Chicago, L. Lee Smith, Hinshaw & Culbertson, Peoria, IL, Clifford G. Kosoff, George J. Casson, Julie A. Bruch, Julie E Sparling, O'Halloran Kosoff Geitner & Cook PC, Northbrook, IL, Daniel Playfair Field, Law Office of Daniel P. Field, Waukegan, IL, James M. Kelly, Commerce Bank Bldg, Peoria, Heidi A. Benson, Flack McRaven & Stephens, Macomb, IL, for Defendants.

## *ORDER*

MCDADE, Chief Judge.

This matter is before the Court on the Defendant's Fed.R.Civ.P. 12(b)(6) Motion to Dismiss Counts VIII and IX of the Plaintiffs' Amended Complaint claiming violations of the Federal Right to Financial Privacy Act and breach of contract. For the following reasons, the Court dismisses both Counts.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 12, 2000, First Midwest Bank ("First") located in Knoxville, Illinois, was robbed by an unknown and non-descript perpetrator. While seen by only two First employees at the time of the robbery, the robber was nevertheless caught on tape by First's video surveillance equipment. Shortly after the robbery, members of the Knoxville and Galesburg Police Departments, the FBI, and several First employees, including Brent Dugan ("Dugan"), viewed First's surveillance videos.

Importantly, neither eye witness nor any other First employee was able to identify the robber prior to viewing the surveillance tapes. However, while viewing the videos, Dugan initially remarked that the robber "looked like" Scott Sornberger ("Scott"), an acquaintance of Dugan and a former customer of First, although Dugan recanted this statement after watching the video further. Additionally, despite initially being unable to identify the robber, one of the eyewitnesses also stated the robber resembled Scott after watching the surveillance videos. This information prompted Rick Pesci ("Pesci"), the Chief of Police of the City of Knoxville, and agents Brian Sharkey ("Sharkey") and Jeff Jackson ("Jackson") of the FBI to further question First employees regarding Scott after viewing the surveillance tapes in their entirety. As a result of this questioning, it was revealed that Scott and his wife, Teresa Sornberger ("Teresa," collectively with Scott as the "Sornbergers"), were former customers of First, although their account had been closed because of a zero or negative account balance, allegedly due to financial difficulties they were experiencing at the time.

Ultimately, the Sornbergers were arrested and incarcerated for approximately four months for robbing First before persuasive evidence was produced establishing the innocence of both Scott and Teresa. As a result of their ordeal, the Sornbergers are suing various Defendants in a nine-count Amended Complaint. The information First's employees provided in response to FBI questioning after viewing the surveillance videos form the basis for Counts VIII and IX of the amended complaint. Alleging this information was an improper disclosure of their private financial records, the Sornbergers' assert a violation of the Federal Right to Financial Privacy Act ("RFPA"), 12 U.S.C. § 3401 *et seq.,* in Count VIII while Count IX asserts a breach of contract claim through a violation of the standard retail banking agreement the Sornbergers entered into with First. Not being a Defendant in any other count of the Sornbergers' Amended Complaint, and being the only Defendant to Counts VIII and IX, First makes the instant motion to dismiss both counts, alleging the Sornbergers' failure to state a claim upon which relief can be granted.

## DISCUSSION

The Court notes that when considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must view the Amended Complaint in the light most favorable to the Plaintiff and the Amended Complaint's allegations must be accepted as true. *Williams v. Ramos,* 71 F.3d 1246, 1250 (7th Cir.1995). Therefore, the complaint can only be dismissed if the Plaintiff cannot prove any set of facts upon which relief can be granted. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429–30 (7th Cir.1996). However, the Court is not bound by a Plaintiff's legal conclusions. *Baxter by*

*Baxter v. Vigo County School Corp.*, 26 F.3d 728, 730 (7th Cir.1994).

As an initial matter, the Court notes First has filed a Motion for Leave to File Reply Brief in Support of Motion to Dismiss. Pursuant to Local Rule 7.1B(1), reply briefs in a Fed.R.Civ.P. 12(b)(6) motion are disallowed except by leave of court. Such leave is warranted in this case because the Court believes the application of the RFPA in the context of a bank robbery is a case of first impression necessitating the most thorough presentation of the issues possible.

## I. *Count VIII–Federal Right to Financial Privacy Act*

■ The basis for Count VIII of the Sornbergers' Amended Complaint is found in § 3402 of the RFPA stating that "no Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution ..." The Sornbergers maintain that First's disclosure to the FBI that their account had been closed due to a zero or negative balance coupled with statements regarding financial difficulties they were then experiencing violated this provision. First responds by stating that there was insufficient involvement by a federal agent to trigger application of the RFPA and that the RFPA was never intended to apply to state criminal matters such as the state robbery arrests of the Sornbergers.

Section 3401 of the RFPA defines "Government authority" as "any agency or department of the United States, or any officer, employee, or agent thereof." As a result, the RFPA only applies to federal actors, a point on which both parties agree. *See, U.S. v. Zimmerman*, 957 F.Supp. 94 (N.D.W.Va.1997). The Sornbergers attempt to fulfill the requirement of disclo-

sure to a federal agent in Paragraph 26 of their amended complaint by stating:

> Either in the course of follow-up questions asked of the bank employees while viewing the surveillance video or during one or more interviews conducted shortly after the viewing, Pesci *and/or* Agents Sharkey and Jackson questioned the bank employees further about Mr. Sornberger, and were told that Mr. Sornberger and his wife were former customers of First Midwest and that the Sornberger's account was closed due to a zero or negative balance and that the two of them were having financial difficulties. (emphasis added.)

Because First's Motion to Dismiss requires construing the Amended Complaint as favorably as possible to the Sornbergers, the Amended Complaint supports the Sornbergers' allegation that First employees made these disclosures directly and exclusively to FBI agents Sharkey and Jackson, or, at the very least, in conjunction with disclosure to state officials. Assuming exclusive disclosure to the FBI agents and the most favorable reading to the Sornbergers, this information was then passed on to local authorities, providing an inference of the necessary motivation for the Sornbergers' commission of the robbery.

In their reply brief, First contends that, at most, this interpretation of the Sornbergers' Amended Complaint relegates the role the FBI played to that of an "information conduit" for the state investigation, or at most a supporting role in such an investigation. Citing *Young v. U.S. Dept. of Justice*, 1988 WL 131302, *2–3 (S.D.N.Y. Nov. 28, 1988), First argues that when the Federal Government merely serves as an information conduit for another entity not covered by the RFPA, no liability attaches because "the Privacy Act restricts the federal government's access to customer rec-

ords for use in investigations conducted by the United States." Thus, if the FBI was not conducting its own investigation but was merely assisting a state investigation, the RFPA would not apply.[1]

However, the Court nonetheless finds the factual allegations of the amended complaint and the reasonable inferences favorable to the Sornbergers drawn from this complaint support more than incidental participation by the FBI at the behest of state actors in the investigation of the First robbery. The primary favorable inference is that the FBI was conducting its own investigation of the robbery.

First, the robbery in question is a federal offense under 18 U.S.C. § 2113, creating an independent basis for federal interest. Additionally, there is evidence suggesting the FBI was already investigating a string of bank robberies similar to the First robbery, having previously compiled a profile of the serial bank robber dubbed "Average Joe Bank Robber." Quite simply, just because the Sornbergers' injuries resulted from state action is insufficient to conclude the FBI's involvement was purely courtesy assistance to the state investigation. The record more than supports an inference that any evidence the FBI shared with state authorities was obtained in the course of an investigation conducted simultaneously by the United States and not one solely in support of an ongoing state investigation.

 Finding that the RFPA applies is only half the battle; there remains the question of whether vel non the information disclosed by First is exempt from RFPA proscription. Congress foresaw the impact of the inevitable sharing of information between federal and state agencies while conducting criminal investigations when it constructed the RFPA. Seeking to foster and encourage such cooperation, Congress specifically exempted "tips" to law enforcement authorities by banks that suspect a customer of engaging in criminal activity in § 3403(c) of the RFPA.[2] *Young v. U.S. Dept. of Justice*, 882 F.2d 633, 637 (2nd Cir.1989) *citing* 12 U.S.C. § 3403(c). "In fact, [Congress] felt so strongly about encouraging voluntary cooperation that it subsequently added a provision preempting any other state or federal law to the contrary." *Id.* However, the only information the RFPA allows banks to provide federal authorities free from liability entails "the name or other identifying information concerning any individual ... involved in and the nature of any suspected

---

1. After completion of this order, the Sornbergers filed a supplemental memorandum indicating that discovery had revealed that disclosure was, in fact, made solely to the FBI and not in conjunction with disclosure to state authorities. Nonetheless, this development does not alter the Court's holding and will not be incorporated into the order.

2. In its entirety, 12 U.S.C. § 3403(c) provides: Nothing in this chapter shall preclude any financial institution, or any officer, employee, or agent of a financial institution, from notifying a government authority that such institution, or officer, employee, or agent has information which may be relevant to a possible violation of any statute or regulation. Such information may include only the name or other identifying information concerning any individual, corporation, or account involved in and the nature of any suspected illegal activity. Such information may be disclosed notwithstanding any constitution, law, or regulation of any State or political subdivision thereof to the contrary. Any financial institution, or officer, employee, or agent thereof, making a disclosure of information pursuant to this subsection, shall not be liable to the customer under any law or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof, for such disclosure or for any failure to notify the customer of such disclosure.

illegal activity." The Sornbergers argue this exemption should not apply to the present facts because no First employees suspected them of committing the robbery, and even if First did suspect the Sornbergers and § 3403(c) was found to apply, the information provided concerning the Sornbergers alleged financial difficulties and reasons for closing their First account goes beyond the scope of the exemption.

To the best of this Court's knowledge, this is the first instance where a plaintiff has sought recourse under the RFPA against a bank for disclosure of information during the investigation of a bank robbery. All previous cases considering the scope of § 3403(c) have done so in the context of financial crimes such as fraud, money laundering, or crimes of a similar nature. *See, e.g., Miranda De Villalba, v. Coutts & Co. (USA) Intern.*, 250 F.3d 1351, (11th Cir.2001) (money laundering); *Puerta v. U.S.*, 121 F.3d 1338 (9th Cir. 1997) (fraud); *Neece v. I.R.S.*, 96 F.3d 460 (10th Cir.1996) (tax evasion); *U.S. v. Frazin*, 780 F.2d 1461 (9th Cir.1986) (mail and wire fraud). When compared to armed robbery, financial crimes such as these pose separate and distinct challenges for law enforcement authorities. Due to the obfuscation often inherent in financial crimes, identifying a suspect will often be as easy if not easier than the more difficult task of identifying and prosecuting the specific crime. That is not the case in most bank robberies, because while the crime is unmistakable, the identity of the perpetrator is usually far from clear. Thus, while identifying both the suspected

crime and its suspected perpetrator often go hand and hand in financial crimes, identifying a suspected robber is often far more difficult than identifying the crime. Seizing upon this anomaly, the Sornbergers argue that for § 3403(c) of the RFPA to apply, the second sentence of this exception not only requires a financial institution's employees to suspect a crime has occurred, but also requires employees to suspect a particular individual of committing that crime before any disclosures made by First may be protected under § 3403(c).[3]

After considering Congress' purpose in drafting the RFPA and the implementing statutory language used, this Court finds that requiring suspicion of a particular individual is only appropriate when the financial institution is providing unsolicited information to a federal authority. When the information is provided after direct questioning by a federal authority-as the Sornbergers allege in Paragraph 26 of their amended complaint-the only requirement under § 3403(c) is that such information be *"relevant* to a *possible* violation of any statute or regulation," a requirement presumptively met by assuming relevancy forms the foundation for the federal inquiry. 12 U.S.C. § 3403(c) (emphasis added).

While not relying on statutory language in their amended complaint, the only conclusion the Court can draw is that the Sornbergers support their reading of a suspicion requirement by First with the second sentence of § 3403(c) limiting the

---

**3.** In their amended complaint, the Sornbergers specifically plead that First did not actually believe they were guilty of the robbery but never specifically indicate why this matters. Regardless, on page 7 of their reply brief, the Sornbergers contend that even if First actually suspected them of involvement in the crime, they would not seek to hold First liable for making a disclosure, but rather seek to hold First liable for the contents of that disclosure. Nonetheless, because the Sornbergers's amended complaint appears to challenge the propriety of any disclosure because of a lack of suspicion by First, and the Court can only logically conclude this challenge is made under § 3403(c), the Court addresses this issue before considering the extent of any disclosure First would be allowed to make.

information a financial institution can provide to the "name or other identifying information" of an "individual, corporation, or account involved in and the nature of any *suspected* illegal activity." 12 U.S.C. § 3403(c) (emphasis added). Congress' use of "suspected" when referencing illegal activity is best analyzed in light of the purpose for which the RFPA was created. The RFPA was passed by Congress in order to provide protection against unrestricted access to financial records to fill the void left by Supreme Court's holding in *United States v. Miller* that a bank customer has no Constitutionally protected privacy interest in bank records. *McDonough v. Widnall,* 891 F.Supp. 1439 (D.Colo. 1995). *See also, In re Porras,* 191 B.R. 357, (Bankr.W.D.Tex.1995) (Function of RFPA is to balance competing interests of financial institutions and federal agencies seeking to discover records of the financial institution's customers.) Thus, Congress sought to balance individual privacy rights with legitimate needs of federal authorities for access to this information.

While seeking to protect an individual's privacy interests in their financial documents, Congress also sought to continue to encourage proactive bank disclosure of suspected violations of the law by their customers without undue fear of liability. Congress achieved this end through § 3403(c) which provides an exception to liability under § 3417(a) of the RFPA for limited disclosures by financial institutions suspecting a customer of illegal activity.[4] The Sornbergers urge this Court to read § 3403(c) to limit these disclosures to encompass only individuals suspected of illegal activity themselves. This Court finds

such a reading too limiting and contradictory to Congressional intent.

On the other hand, an individualized suspicion requirement is appropriate when a bank proactively discloses financial information protected by the RFPA. Requiring individualized suspicion in that instance protects a customer's expectations of privacy while balancing the legitimate government interest in exposing financial crimes that banks and other financials institutions are often in the best position to identify. In many situations, the Government is unaware of the suspected violations and needs to rely upon the diligence of financial institutions exposing such violations; exposure that would be compromised or eliminated if financial institutions were subject to liability for even limited disclosures. Therefore, requiring an element of individualized suspicion in these situations should generate appropriate caution by financial institutions to ensure customers' financial records remain private while neither preventing these same institutions from disclosing limited information about suspected illegal activity for fear of liability nor preventing Government notification of potential legal violations.

However, this is not the case now before the Court. Here, First notified the FBI a robbery had occurred, and, under direct questioning from the FBI, divulged the disputed information regarding the Sornbergers. Even assuming as the Court must that no First employee suspected the Sornbergers of robbing the bank, the Court finds this fact alone to be insufficient to remove the protections afforded by § 3403(c). Requiring individualized suspicion by employees of a financial insti-

---

4. While not directly applicable to this case, the Ninth Circuit has held that this exemption is not solely limited to proactive disclosures by a financial institution but also extends to disclosures in response to direct Government inquiries where the Government's questions are not in response to notification of a possible legal violation by the financial institution. *See, Puerta v. U.S.,* 121 F.3d 1338 (9th Cir. 1997).

tution in response to direct questioning initiated by the Government would eviscerate the delicate balance between the need to protect customer's privacy with the need of the Government for limited access to certain information struck by § 3403(c).

Rarely will a bank specifically suspect a particular customer in a robbery. As a result, requiring the bank to possess individualized suspicion in these circumstance would likely thwart investigation of the crime. However, if the bank did possess such suspicion, the proactive disclosure of limited information regarding this suspect is still protected by § 3403(c) similar to the protection accorded financial crimes. Therefore, in the case of a financial institution's responses to the Government's direct questioning, this Court finds that the Government's suspicion of a particular individual-no matter how tenuous-is sufficient to meet the relevancy requirements of § 3403(c).

In the instant case, the FBI's questions were clearly prompted by some suspicion, no matter how slight, that the Sornbergers may have been involved in the First robbery; the FBI at the very least thought information regarding the Sornbergers possessed some relevancy to their investigation. Not allowing First to respond to these questions, even in the limited manner allowed by § 3403(c), would frustrate both the investigation of the robbery and the balance Congress tried to strike in the RFPA.

■ Having found that any lack of individualized suspicion by bank employees is insufficient to prevent application of the exemption in § 3403(c), the Court must still address whether or not the First employee's disclosures exceeded the scope of the exemption.[5] First's disclosure will only be protected if such disclosure is limited to "the name or other identifying information concerning any individual … involved in and the nature of any suspected illegal activity." 12 U.S.C. § 3403(c). The Sornbergers' contend that the reason their First account was closed or whether or not they were experiencing financial difficulties at the time is not covered by the exemption.

While there is limited guidance in case law interpreting the scope of disclosure under § 3403(c), the Court nonetheless finds the Eleventh Circuit's holding in *Miranda De Villalba, v. Coutts & Co. (USA) Intern.*, 250 F.3d 1351 (11th Cir.2001) instructive. In a money laundering case, the Court in *Coutts* found the specific mention of the amount of a wire transfer to not exceed the "nature" of the suspected illegal activity because what made the request suspicious was its size, even if the size of the transfer was not a specific element of the crime. *Id.* at 1354. In the current facts, what made the Sornbergers suspicious was a possible motive for the bank robbery and their familiarity with First. Adopting the logic of *Coutts*, the motive for a criminal action would definitely be included in the "nature" of the illegal activity. As a result, the First employees' disclosures did not exceed the permissible scope of § 3403(c). *See also, Bailey v.*

---

**5.** With a liberal reading of their Amended Complaint, the Sornbergers can be seen to also be challenging the initial disclosure of First employees originally implicated Scott that occurred while watching the surveillance tapes but before being questioned by the FBI. At this time, the disclosure was simply a statement to the effect that the robber looked like Scott, a statement that was later recanted.

When this statement was made, the purveyor of the statement did actually *suspect* Scott of robbing First. Even if such suspicion was fleeting and only briefly held, it is sufficient for protection under § 3403(c) as the simple identification of a First customer while the bank employee was under suspicion that Scott was involved in the robbery.

*U.S. Dept. of Agriculture,* 59 F.3d 141, 143 (10th Cir.1995) (disclosure of amount of withdrawals in food stamp log were within "nature" of crime of food stamp fraud because the amount of the withdrawal being roughly equal to a contemporaneous deposit amount is what made the activity suspicious).

## II. *Count IX–Breach of Contract*

■ Count IX of the Sornbergers' complaint is a breach of contract action in which they allege they entered into First's standard retail banking agreement ("Agreement") which First subsequently breached in three ways. Primarily, the Sornbergers allege the Agreement included an express undertaking by First not to disclose any financial information about the Sornbergers to any third party absent consent, permission under applicable law, or such disclosure was required pursuant to a warrant or subpoena. Second, the Sornbergers contend that under the Illinois Uniform Commercial Code ("Illinois UCC") the Agreement incorporates usage of the banking trade as a term of the contract. The Sornbergers claim it is the usage of the banking trade not to disclose a customer's financial information to law enforcement authorities when the bank has been the victim of a crime unless the bank actually believes that a specific customer is the perpetrator of that crime, the customer consents, or a warrant or subpoena is issued for the information; exceptions they contend do not apply to the instant facts. Finally, the Sornbergers allege the Agree-

ment warranted that First maintain policies and engage in employee training sufficient to prevent improper disclosures of a customer's financial information. The Sornbergers maintain that the existence of improper disclosures demonstrates that these policies and training were insufficient.

According to Paragraph 94 of the Sornbergers' amended complaint, First would not be liable for the disclosure of their financial information if First received consent, the disclosure was permitted by applicable law, or disclosure was required pursuant to a valid warrant or subpoena. Because neither consent, a warrant, nor a subpoena apply under the facts of this case, First's disclosure will only be exempted from violating the express terms of the parties' agreement if the disclosure was permitted by applicable law.[6]

The applicable law applied by the Sornbergers in their complaint and alleged to violate this agreement is the Illinois Banking Act, 205 ILCS 5/48.1, ("IBA"), and the aforementioned RFPA. Having previously found that First's disclosure was permissible under § 3403(c) of the RFPA, the Court turns to First's potential liability under the IBA. Assuming that the information disclosed regarding the Sornbergers was a "customer financial record" as defined in § 5/48.1(a) of the IBA, First's disclosure will not be a violation of the IBA if the information was provided "to the appropriate law enforcement authorities where the bank reasonably believes it

---

**6.** In reaching its ultimate conclusion, the Court is not addressing numerous issues raised by the parties in their briefs. The Court is ignoring the issues of whether or not the disclosed information violated the Agreement as well as the very existence of this Agreement, both of which are disputed issues by First. Additionally, the Court ignores the question of whether or not such a contract could even apply to the Sornbergers because they were not current First customers at the time of the disclosures. The Court finds that these issues do not need to be addressed for disposition of the Sornbergers' breach of contract claim, and the Court therefore assumes in the Sornbergers favor that the Agreement did exist, continues to apply, and the disclosed information would be in violation of this Agreement if prohibited by applicable law.

has been the victim of a crime." 205 ILCS 5/48.1(b)(7). It cannot be disputed First reasonably believed it was the victim of a crime. As a result, the plain language of the statute indicates disclosure will be permitted in such instances.

The Sornbergers contend reading the statute in this manner is overly broad and argue that a requirement of individualized suspicion by a bank should be read into § 48.1(b)(7) before the bank should be allowed to release any information otherwise protected under the IBA. According to the Sornbergers, not requiring individualized suspicion would cause all of a bank's customers to lose the protection of the IBA if the bank were to believe it had become the victim of a crime. With arguments stretching the limits of credibility, the Sornbergers principally support their position by arguing that the Agreement incorporates the Illinois UCC's usage of the banking trade in the terms of the contract. Consequently, the Sornbergers claim, "it is a usage of the banking trade not to disclose a customer's financial information to law enforcement authorities even when the bank has been the victim of a crime, unless the bank also actually believes that that specific customer is the perpetrator of that crime or unless the customer consents or a proper warrant is issued for the information." While reached in a different manner, the Sornbergers make an argument under the IBA strikingly similar to their argument under the RFPA, but ultimately just as impotent.

Fortunately, addressing the arguments the Sornbergers proffer for finding a violation of the IBA and resulting in a breach of contract is a vicissitude this Court need not further address to dispose of this issue. Instead, the Court notes that the RFPA specifically provides that any information properly provided under § 3403(c) of the RFPA "may be disclosed notwithstanding any constitution, law, or regulation of any State or political subdivision thereof to the contrary." *See also, Young,* 882 F.2d at 637 *citing* 12 U.S.C. § 3403(c). Therefore, even accepting the notion that First's disclosure violated the IBA and any provisions of the Illinois UCC, because this Court previously found First's disclosure was permitted under § 3403(c) of the RFPA, neither the IBA or the UCC can be considered applicable law. "Because federal law is the supreme law of the land, it preempts state laws that 'interfere with, or are contrary to, federal law.' A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption." *Boomer v. AT & T Corp.,* 309 F.3d 404, 417 (7th Cir.2002) *citing Hillsborough County Fla. v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

Therefore, because the Court finds First's disclosure was permitted under the RFPA, any possible violation of the IBA or Illinois UCC is moot. Moreover, because the IBA is not applicable law under the doctrine of federal preemption, even the possibility of its violation cannot violate the terms of the agreement between the Sornbergers and First based upon the pleadings in Paragraph 94 of the Sornbergers' complaint. Further, because the Court finds that First did not violate the RFPA or breach the express provisions of their agreement with the Sornbergers through the improper disclosure of the Sornbergers' financial information, the Sornbergers' claim that First failed to maintain policies or engage in employee training to prevent the improper disclosures of a customer's financial information must also fail. Consequently, as a result of the foregoing, First's Motion to Dismiss Counts VIII and IX of the Sornbergers' complaint under Fed.R.Civ.P. 12(b)(6) is granted.

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss Counts VIII and IX of the Plaintiff's Amended Complaint is GRANTED and Counts VIII and IX of the Plaintiff's Amended Complaint are HEREBY DISMISSED.