**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IMPOSSIBLE FOODS INC., | No. 21-16977 |
| *Plaintiff-Appellant*, | D.C. No. 5:21-cv-02419-BLF |
| v. | |
| IMPOSSIBLE X LLC, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Northern District of California
Beth Labson Freeman, District Judge, Presiding

Argued and Submitted December 6, 2022
San Francisco, California

Filed September 12, 2023

Before: Carlos F. Lucero,[*] Daniel A. Bress, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge VanDyke

---

[*] The Honorable Carlos F. Lucero, United States Circuit Judge for the
U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

# SUMMARY[**]

## Personal Jurisdiction

The panel reversed the district court's dismissal, for lack of personal jurisdiction, of a trademark declaratory judgment action brought against Impossible X, LLC, by Impossible Foods, Inc., a corporation that manufactures and markets plant-based meat substitutes, and remanded for the district court to consider the merits of Impossible Foods' claims.

Impossible X, now a Texas LLC, is a one-person company run by Joel Runyon, a self-described "digital nomad" who for two years operated his business from San Diego. Impossible X sells apparel, nutritional supplements, diet guides, and a consulting service through its website and various social media channels. Impossible Foods sued Impossible X in federal court in California, seeking a declaration that Impossible Foods' use of the IMPOSSIBLE mark did not infringe on Impossible X's trademark rights.

The panel held that Impossible X was subject to specific personal jurisdiction in California because it previously operated out of California and built its brand and trademarks there, and its activities in California were sufficiently affiliated with the underlying trademark dispute to satisfy the requirements of due process. First, Impossible X purposefully directed its activities toward California and availed itself of the privileges of conducting activities there by building its brand and working to establish trademark rights there. Second, Impossible Foods' declaratory

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

judgment action arose out of or related to Impossible X's conduct in California because Impossible X's trademark building activities formed the basis of the contested trademark rights.  The panel did not confine its analysis to Impossible X's trademark enforcement activities, but rather concluded that, to the extent the Federal Circuit follows such an approach for patent declaratory judgments, that approach is not justified in the trademark context.  Third, the panel concluded that there was nothing unreasonable about requiring Impossible X to defend a lawsuit based on its trademark building activities in the state that was its headquarters and Runyon's home base, and that continued to be a business destination for Runyon and Impossible X.

Dissenting, Judge VanDyke wrote that Impossible X was not subject to specific personal jurisdiction in California because Impossible Foods waived any argument that Impossible X's brand-building activities create specific jurisdiction.  Even ignoring wavier, Impossible X did not purposefully direct any trademark enforcement activity at California, and this declaratory judgment action did not arise out of or relate to Impossible X's relevant activities in California.

## COUNSEL

William H. Brewster (argued) and Theodore H. Davis, Jr., Kilpatrick Townsend & Stockton LLP, Atlanta, Georgia; Gia L. Cincone, Kilpatrick Townsend & Stockton LLP, San Francisco, California; for Plaintiff-Appellant.

Thomas M. Johnson, Jr. (argued), David E. Weslow, and Adrienne J. Kosak, Wiley Rein LLP, Washington, D.C.;

Kevin K. Eng, Markun Zusman Freniere & Compton LLP, San Francisco, California; for Defendant-Appellee.

**OPINION**

BRESS, Circuit Judge:

We determine whether a California federal court in a trademark declaratory judgment action has personal jurisdiction over a one-person company run by a self-described "digital nomad" who for two years operated his business from San Diego. We hold that Impossible X, the declaratory judgment defendant, is subject to specific personal jurisdiction in California because it previously operated out of California and built its brand and trademarks there. Impossible X's activities in the forum state are sufficiently affiliated with the underlying trademark dispute to satisfy the requirements of due process. We reverse the district court's dismissal of the plaintiff's complaint.

I

A

Declaratory judgment plaintiff Impossible Foods, a Delaware corporation, manufactures and markets plant-based meat substitutes. This includes the "Impossible Burger," which is sold in grocery stores and restaurants nationwide. Impossible Foods' principal place of business is in Redwood City, California. Declaratory judgment defendant Impossible X, now a Texas LLC, sells apparel, nutritional supplements, diet guides, exercise plans, and consulting services through its website and various social media channels. Impossible X is solely owned and operated

by entrepreneur Joel Runyon, who currently resides in Austin, Texas.

Impossible X and Impossible Foods use a similar all-caps version of the word "IMPOSSIBLE" to market their products.   Both companies have federally registered trademarks for their versions of the IMPOSSIBLE mark. Runyon first used the mark on his personal fitness and lifestyle blog in 2010.  The purpose of the blog was to encourage Runyon himself and others "to push ourselves to our limits and do something impossible."  In 2012, Runyon in his personal capacity registered the IMPOSSIBLE mark for use on a website featuring information on personal fitness and "adventure activities."

Shortly thereafter, Runyon turned his personal blog into a business, forming Impossible Ventures LLC as an Illinois legal entity.   Runyon changed the name of the LLC to Impossible X in 2016.  Between 2014 and 2018, Impossible X obtained several additional trademark registrations related to the original IMPOSSIBLE mark, such as IMPOSSIBLE FITNESS and IMPOSSIBLE HQ.  Impossible X uses these marks on numerous nationwide platforms, including several domain names, an Amazon e-commerce platform, and a YouTube channel.

Though Impossible X ambitiously expanded its virtual footprint, it has fewer ties to the physical world.  Impossible X has no employees or outside investors, has no manufacturing or production facilities, and does not itself own or rent any office space.  The company is, for all practical purposes, an extension of Joel Runyon, who claims to "handle[] business for Impossible LLC . . . remotely from wherever I happen[] to be."

As it happens, Runyon—who refers to himself as a "digital nomad"—has worked from several places since he first registered the IMPOSSIBLE mark. While Runyon has traveled extensively, his ties to California are substantial, at least as related to the present dispute.

Although Runyon never registered Impossible X to do business in California, San Diego served as Impossible X's de facto headquarters from 2014 to 2016. Runyon claims he split his time between San Diego and New York City during this period, but he also described San Diego as a "base point," and his Impossible X business activities were clearly concentrated there. In these years, Runyon rented both an apartment and a workspace in San Diego from which he ran Impossible X. He did not rent workspace in New York or elsewhere. (Runyon's primary reason for spending time in New York was due to a personal relationship.)

In social media posts from Impossible X accounts, Runyon referred to his San Diego workspace—a room he rented from the cross-fit gym where he worked out—as "impossiblehq" and "impossibleheadquarters." Runyon expressed excitement about "[s]etting up shop" there and "hav[ing] a dedicated spot for videos and writing." In an Instagram post, Runyon also described his gym-adjacent office as "[m]y new favorite place to work in San Diego," telling his social media followers that he just had to "finish up putting @impossibleheadquarters branding on everything now." Runyon's LinkedIn profile listed "San Diego, California" as the "headquarters" for Impossible Ventures (later renamed Impossible X). In a blog post on an Impossible website, Runyon promoted his San Diego office as a place where he could "build a team" and "do calls and do meetings."

While living in San Diego, Runyon endeavored to build recognition for Impossible X. The record contains various marketing efforts and social media posts in which Runyon touted the Impossible brand, including through photos of himself wearing fitness gear with the Impossible mark. When promoting the Impossible X brand on social media, Runyon frequently tagged San Diego as his location. For example, in a June 2014 post from the "impossiblehq" Instagram handle, Runyon promoted his new Impossible X fitness gear, adding hashtags for #sandiego and #sd. And in January 2015, Runyon posted to Twitter that he "[c]ame home to San Diego and found my brand new #impossible hoodie waiting for me." Runyon also promoted Impossible X in a segment on the local news. In an Instagram post, Runyon featured a screenshot of himself (clad in an Impossible X t-shirt) being interviewed under the storyline "New Local App Aims to Relieve Sitting Pain," adding hashtags for "#sd" and "#sandiego."

While operating out of his base in California, Runyon also leveraged the Impossible X brand to promote various "paleo" diet and recipe guides. For example, in a June 2015 blog post from an Impossible X website, he mentioned that he was "starting to build a team both at Impossible and on Ultimate Paleo Guide." In another post, Runyon referenced a "workshop on the paleo projects that I've been building over the past couple years." Later, Runyon used the Impossible brand in connection with his "Paleo.io" and "Paleo Recipe Pro" software applications.

In June 2016, Runyon left his "base point" in San Diego and started living a fully nomadic lifestyle. Although Runyon had rented the gym office in his own name, in his letter to his landlord giving notice of vacating the lease, he signed it "Joel Runyon[,] Impossible X LLC." For the next

two years, Runyon ran his business remotely as he traveled and worked in Europe and elsewhere.

In January 2019, Runyon settled in Austin, Texas. Two years later, he formed Impossible LLC in Texas and merged his Illinois LLC into it. He also assigned the Impossible trademark registrations to the new Texas entity. In social media posts, Runyon would later reflect that San Diego was the "nicest place," but that it was "tougher to grow business there." As Runyon would post in August 2019, "san diego is great, but taxes 👎. better entrepreneur community in austin."

Though Runyon moved out of California in 2016, he still had frequent business-related contacts with the state. Runyon in February 2017 described his "homebase" as "socal-ish (San diego) and NYC usually. couple years back was Chicago." As indicated by social media posts (some from Impossible-branded accounts) and flight records, Runyon made at least eight trips to California between October 2017 and December 2019. Runyon describes these trips as personal in nature, although he would still perform Impossible X-related work while on the road. And, as recently as 2021, Impossible X made plans with a Los Angeles-based company to manufacture apparel using the IMPOSSIBLE mark.

When Runyon returned to California in the years after he left, he continued to promote the Impossible brand in connection with California. In 2018, Runyon's personal Instagram account and the @impossiblehq account shared several posts tagged with California locations that advertised Impossible X content and products. For example, in August 2018, Runyon tweeted asking "[w]ho in the San Diego/Encinitas area" he should host on his Impossible X

podcast.  In November 2018, the Impossible X Twitter account promoted an interview that Runyon recorded with an athlete in West Hollywood.  In 2018 and 2019, Impossible X posted to Instagram photos of athletes wearing Impossible-branded shirts at iconic locations in California, such as near the Golden Gate Bridge.  Cumulatively, Runyon spent at least two months in San Diego in 2018 alone.

B

The trademark dispute between Impossible Foods and Impossible X began in the summer of 2020 when the U.S. Patent and Trademark Office (USPTO) published for opposition three trademark applications filed by Impossible Foods.  On November 10, 2020, Impossible X sent a letter to Impossible Foods demanding that Impossible Foods cease using its "confusingly similar IMPOSSIBLE designs . . . and limit the use of its IMPOSSIBLE mark to only use in association with plant-based food substitutes."

On November 25, 2020, Impossible X filed a notice of opposition before the USPTO Trademark Trial and Appeal Board (TTAB) for one of Impossible Foods' trademark applications.  In this opposition, which we discuss further below, Impossible X opposed Impossible Foods' intent to use the IMPOSSIBLE mark in connection with "recipes, ingredients and cooking information."  In March 2021, with the TTAB proceedings ongoing, Impossible Foods proposed a settlement agreement, but Impossible X declined it.

In April 2021, Impossible Foods went on the offensive, filing this declaratory judgment action in federal court in California.  In its complaint, Impossible Foods sought a declaration that its use of the IMPOSSIBLE mark did not infringe on Impossible X's trademark rights, and that the Impossible Foods' rights to the mark were superior.  The

TTAB proceedings were stayed pending resolution of this lawsuit. Following jurisdictional discovery, the district court dismissed the case for lack of personal jurisdiction.

In a thoughtful opinion, the district court acknowledged that the personal jurisdiction question was "a close one." The court first concluded that Impossible X had purposefully directed relevant business activities at California, finding that Impossible X "did begin 'building' and marketing its meal and nutrition business . . . in San Diego in 2014 and using its name in that context." The district court also acknowledged Impossible X's other "intentional conduct" directed at California, including Impossible X's use of San Diego office space and its business relationships with California companies.

Though the district court found that Impossible Foods satisfied the "purposeful direction or availment" requirement, it reasoned that Impossible Foods' declaratory judgment action did not arise out of or relate to Impossible X's contacts with California. According to the district court, that was because, per its trademark registrations, Impossible Foods did not begin to use its mark in commerce until June 2016, by which point Runyon had already left San Diego. In the district court's view, because the parties had a live dispute only as of June 2016, Impossible X's contacts with California prior to that time were irrelevant to personal jurisdiction.

Impossible Foods timely appeals. We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's dismissal for lack of personal jurisdiction. *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 978 (9th Cir. 2021).

## II

In exercising personal jurisdiction, a federal district court is constrained by the Fourteenth Amendment's Due Process Clause and the long-arm statute of the state in which it sits. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021); *Burri L. PA v. Skurla*, 35 F.4th 1207, 1212 (9th Cir. 2022). The Due Process Clause permits the exercise of personal jurisdiction if the defendant has sufficient "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945). Because California courts may exercise jurisdiction on any basis not inconsistent with due process, Cal. Civ. Proc. Code § 410.10, the jurisdictional analysis in this case is the same under state and federal law. *See Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006) (en banc) (per curiam).

Personal jurisdiction can be either general or specific. A court may exercise general jurisdiction "only when a defendant is 'essentially at home' in the State." *Ford Motor Co.*, 141 S. Ct. at 1024 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). For a corporate defendant, general jurisdiction is paradigmatically appropriate in the state in which the entity is incorporated or where it maintains its principal place of business. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Impossible X is not registered as a California LLC, does not currently maintain its principal place of business in California, and at least as of now is not otherwise "at home" there. *Goodyear*, 564 U.S. at 919. Impossible Foods thus

does not argue that Impossible X is subject to general jurisdiction in California.

Specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co.*, 141 S. Ct. at 1024. Distilling Supreme Court precedent, we have articulated three requirements for establishing specific jurisdiction over a non-resident defendant:

> (1) the defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (alterations and quotations omitted). Impossible Foods bears the burden on the first two prongs. *Ayla*, 11 F.4th at 979. If they are met, Impossible X then "must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008)).

We hold that Impossible X's brand-building activities in California since 2014 are sufficiently related to the instant trademark dispute to confer personal jurisdiction. Impossible X purposefully directed its activities toward California and availed itself of the privileges of conducting activities there by building its brand and working to establish

trademark rights there.  Impossible Foods' declaratory judgment action "arises out of or relates to" Impossible X's conduct in California because its trademark building activities form the basis of the contested trademark rights— rights which Impossible X broadly asserted in the TTAB opposition that triggered this action.  Finally, there is nothing unreasonable about requiring Impossible X to defend a lawsuit based on its trademark building activities in the state that was its "headquarters" and Runyon's "home base," and that continued to be a business destination for Runyon and Impossible X.  Explaining each of these points requires some analysis, to which we now turn.[1]

---

[1] Impossible Foods did not waive its argument that Impossible X's trademark building activities in California supply a basis for personal jurisdiction.  The dissent belabors this point, but it is clearly wrong.

In its opposition to Impossible X's motion to dismiss, Impossible Foods argued that Impossible X's California business activities were relevant both to the "purposeful direction/availment" and the "arising out of / related to" prongs of the specific jurisdiction analysis.  At the outset, Impossible Foods argued that Impossible X satisfied the "intentional act" requirement in "multiple ways," including by sending a cease-and-desist letter but also by "engag[ing] in promotional, business development and sales activities using the IMPOSSIBLE mark from California."  Then, on the "express aiming" element of purposeful direction, Impossible Foods argued that Impossible X "operated its business and promoted its activities from and to California—intentional conduct that bears on the two elements of [Impossible X's] infringement allegations, whether [Impossible X] has superior common-law rights and whether [Impossible Foods'] use of its IMPOSSIBLE mark is likely to cause confusion."  Lastly, and at the risk of repetition, Impossible Foods argued that its declaratory judgment action arose in part out of Impossible X's "business interests in [California] that are tied to the underlying litigation threat," and that Impossible X's activities in California—such as Impossible X "'building' its meal and nutrition

business" there—formed the "linchpin of its trademark allegations against" Impossible Foods.

The dissent is thus quite plainly mistaken in claiming that "[i]n its opposition to Impossible X's motion to dismiss, Impossible Foods identified only Impossible X's trademark enforcement activities as relevant to the first two prongs" of the jurisdictional analysis. At the bare minimum, Impossible Foods is elaborating upon and prioritizing an argument based on trademark building that it raised below, which is permissible. *See, e.g.*, *Puerta v. United States*, 121 F.3d 1338, 1341–42 (9th Cir. 1997). Indeed, as we have held, "appellants can make any argument in support of their claim on appeal—they are 'not limited to the precise arguments they made below.'" *Allen v. Santa Clara Cnty. Corr. Peace Officers Ass'n*, 38 F.4th 68, 71 (9th Cir. 2022) (citing *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992)).

Regardless, the district court itself concluded that, although Impossible X's "general business contacts" were "'expressly aimed' at California because they occurred there," the declaratory judgment action nonetheless did not "arise[] out of" these activities (based on an erroneous timing theory that we address below in Part II.B.3). The dissent claims the district court discussed these points "only as an aside." In fact, the district court spent several *pages* of analysis explaining why Impossible X's trademark building contacts were sufficient to establish purposeful direction/availment, yet insufficient to meet the "arising out of or relating to" requirement. Because the district court addressed the trademark building activities and treated them as an independent basis for personal jurisdiction, we will not find the argument waived. *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1054 (9th Cir. 2007) (noting that an appellate court will not deem an "issue waived if the district court actually considered it").

The dissent would find Impossible Foods' trademark building argument waived on the theory that Impossible Foods "expressly disavowed" any reliance on Impossible X's business activities as a basis for specific jurisdiction. But the dissent conjures a forceful declaration of waiver from what is, at best, the permissible prioritization of different arguments below. Though we can all agree that Impossible Foods did argue that Impossible X's enforcement activities served as a

A

Under the first prong of our three-part analysis, to be subject to specific jurisdiction the defendant must purposefully direct its activities toward the forum state, purposefully avail itself of the privileges of conducting activities there, or engage in "some combination thereof." *Yahoo!*, 433 F.3d at 1206. Typically, whether we analyze a defendant's contacts under the purposeful direction or purposeful availment test "turns on the nature of the underlying claims." *Ayla*, 11 F.4th at 979. When a defendant's conduct primarily occurs outside the forum state, we generally apply the purposeful direction test and look to whether the defendant expressly aimed acts at the

_____

jurisdictional hook, the dissent is wrong to suggest that Impossible Foods' reliance on this theory was "exclusive."

Rather, the record shows that in the hearing before the district court on which the dissent relies, Impossible Foods argued that Impossible X's business activities in California were supportive of specific jurisdiction, emphasizing that California was "where the trademark is located," where Runyon had "operated his business historically," and where he "has had routine and systemic contacts." Far from "expressly disavowing" this basis for jurisdiction, Impossible Foods was careful to "reiterate[]" that it "pointed to much more than the cease and desist letter," including "a rich history of forum context going back close to a decade" and "online evidence of blog posts and social media posts . . . identifying the physical presence of [Impossible X] in California." The dissent claims that "[c]ounsel opined that Impossible Foods's exclusive reliance on th[e] enforcement activities had been 'very clear' from the start of litigation." But the quote from counsel was: "I think we have been very clear in our papers, Your Honor, that we are arguing specific jurisdiction."

In short, in the district court and on appeal, Impossible Foods has argued that specific personal jurisdiction is proper in California based on Impossible X's "business development and sales activities." Although we agree with the dissent that the questions presented in this case are difficult, we are duty-bound to resolve them. We cannot avoid them through an inaccurate accounting of the proceedings below.

forum state knowing that they would harm the plaintiff there. *Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 603–04 (9th Cir. 2018); *see also Ayla*, 11 F.4th at 979. Purposeful availment, meanwhile, is satisfied when "the defendant has taken deliberate action within the forum state or . . . has created continuing obligations to forum residents." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). Thus, "[p]urposeful availment generally provides a more useful frame of analysis for claims sounding in contract, while purposeful direction is often the better approach for analyzing claims in tort." *Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020).

Outside the declaratory judgment context, we have stated that because "[t]rademark infringement is treated as tort-like for personal jurisdiction purposes," the purposeful direction framework is most applicable. *Ayla*, 11 F.4th at 979; *see also, e.g.*, *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1035 (9th Cir. 2023); *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1090–91 (9th Cir. 2023). But we have specifically recognized that "our cases do not impose a rigid dividing line" between purposeful availment and purposeful direction. *Global Commodities*, 972 F.3d at 1107; *see also Freestream Aircraft*, 905 F.3d at 605 (similar); *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023) (noting that we have never held that the distinction between purposeful direction and availment is "a hard-and-fast rule"). Although the distinction between purposeful availment and direction is often a useful and appropriate doctrinal table-setting device, "there's no need to adhere to [this] iron-clad doctrinal dichotomy" in every case. *Davis*, 71 F.4th at 1162. Indeed, such a doctrinal

dichotomy could be an ill-fit for evaluating a declaratory judgment case in which the traditional roles of plaintiff and defendant are reversed, especially when, as here, the defendant's actions were largely taken from *within* the state. *See Freestream Aircraft*, 905 F.3d at 605 (explaining that "[t]he effects doctrine . . . makes more sense when dealing with out-of-forum tortfeasors").

At the end of the day, the purposeful direction and availment tests simply frame our inquiry into the defendant's "purposefulness" vis-à-vis the forum state, ensuring that defendants are not "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Global Commodities*, 972 F.3d at 1107 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). And by that general metric, we easily conclude, as the district court did, that Impossible X purposefully directed its activities toward California and/or purposefully availed itself of the benefits and privileges of California's laws.

Although Impossible X is now a Texas company, it for years operated *based out of California*. For that time, it could reasonably be argued that Impossible X was subject to *general* jurisdiction in the Golden State because Impossible X's contacts were "so constant and pervasive 'as to render it essentially at home'" there. *Daimler AG*, 571 U.S. at 122 (quoting *Goodyear*, 564 U.S. at 919). These were not somehow "sporadic" activities in California, as the dissent claims.

Between 2014 and 2016, Runyon—and by extension, Impossible X—was based in California for many months out of the year. Runyon maintained both a personal residence and workspace in California and conducted his business activities on behalf of Impossible X from the company

"headquarters" in San Diego. Impossible X specifically described itself as having a San Diego "hq," "setting up shop" there in an office festooned with company logos while trying to "grow business" in the San Diego area. Many of Impossible X's marketing efforts explicitly sought to establish a connection between the company and the physical location ("#sandiego," "#sd"). And Impossible X's founder, sole member, and brand incarnate treated San Diego as his "home base," "base point," and "home." Even after Runyon left California, he continued to return and do business there through Impossible X. *See Yahoo!*, 433 F.3d at 1207 ("[W]e must evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant.").

To the extent Impossible X asks us to disassociate Runyon's California contacts from those of the LLC, we reject that position on these facts. When the company was comprised of Runyon and operated "wherever [Runyon] happened to be," Runyon's own Impossible X-related activities in and directed toward California cannot be ignored. Impossible X did not act in any other way except through Runyon. And calling oneself a "digital nomad" does not erase activities sufficient to establish jurisdiction in the forum state.

Under all these circumstances, we think it clear that Impossible X directed its activities toward California through "deliberate action[s] within the forum state." *Freestream Aircraft*, 905 F.3d at 604 (quoting *Ballard*, 65 F.3d at 1498). Runyon and Impossible X's dedicated multi-year "base" in the forum and extensive promotional activities in California were not merely "'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King*, 471 U.S. at 475 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S.

770, 774 (1984), and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980)).

The dissent argues that Impossible X's trademark-building activities alone cannot satisfy the "purposeful direction" prong of the specific jurisdiction analysis because Impossible X did not aim this conduct at California with the knowledge that it would cause trademark-related harm there. But in taking this view, the dissent would impose the very "iron-clad doctrinal dichotomy" between purposeful availment and direction that we have recently (and repeatedly) said need not govern in every case. *See, e.g.*, *Davis*, 71 F.4th at 1162; *Global Commodities*, 972 F.3d at 1107; *Freestream Aircraft*, 905 F.3d at 605.

Though purposeful direction does require some degree of knowledge that the plaintiff will be harmed in the forum state, this is to ensure that "the *defendant*'s actions connect him to the *forum*." *Walden*, 571 U.S. at 289 (emphasis in original). That connection obviously exists in this case. When, as here, the defendant's conduct indisputably occurred *in* the forum state—and where the defendant was in fact *based there*—there is no further requirement that the defendant have specific knowledge that its in-state conduct would eventually cause harm in that jurisdiction. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 803 (9th Cir. 2004) (describing the purposeful direction test as applying when "the defendant's actions outside the forum state . . . are directed at the forum"); *Freestream Aircraft*, 905 F.3d at 605 (explaining that "a purposeful direction analysis naturally applies in suits sounding in tort where the tort was committed outside the forum state"). Instead, when the defendant has operated from within the jurisdiction, we focus on whether the defendant's "entire course of dealing"—and "not solely the particular . . . conduct giving

rise to the claim"—establishes sufficient minimum contacts to satisfy due process. *Global Commodities*, 972 F.3d at 1108.

Under this standard, we cannot simply ignore Impossible X's California contacts on the theory that it had no knowledge at the time that its actions in the forum state could lead to a dispute like this. And it is hardly novel to say that a company that operated from California for years availed itself of that state's privileges and directed its activities there. The dissent's hyperbolic assertion that we have engaged in "potentially the most radical reimagining and expansion of specific jurisdiction in decades" is obviously false.

We note that Impossible Foods does also argue that Impossible X is subject to personal jurisdiction in California because Impossible X "purposefully directed" its trademark *enforcement activities* there. Impossible Foods points principally to Impossible X's cease and desist letter to Impossible Foods (sent to its outside counsel in Washington State) and Impossible X's TTAB opposition (filed in the Washington, DC area). Impossible Foods claims that these enforcement actions were effectively directed toward California because Impossible Foods is based there. In its view, California is thus the location where the effects of any restrictions on its trademark use would likely be felt.

Because we have concluded that Impossible X's trademark building activities are sufficient to satisfy the purposeful direction/availment prong, we do not decide whether Impossible X's trademark enforcement activities could serve as further support for personal jurisdiction. Our precedent counsels caution in this regard. Citing the "strong policy reasons to encourage cease and desist letters," *Yahoo!* held that in the usual case, "[a] cease and desist letter is not

in and of itself sufficient to establish personal jurisdiction over the sender of the letter." 433 F.3d at 1208. In *Yahoo!*, we ultimately found personal jurisdiction over foreign defendants in California based on their successful efforts to obtain and enforce French court orders "directing Yahoo! to take actions in California, on threat of a substantial penalty." *Id.* at 1209. Although Impossible Foods tries to analogize the TTAB opposition to the French orders in *Yahoo!*, there are obvious differences between the two, most notably that the TTAB has no authority to grant injunctive or monetary relief (indeed, the TTAB has not issued any decision here at all). We are also mindful that under *Walden*, we must "look[] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there," because "the plaintiff cannot be the only link between the defendant and the forum." 571 U.S. at 285.

Impossible X's commercialization efforts in California are sufficient to establish both the purposeful availment/direction requirement and the remaining requirements for personal jurisdiction, as we next explain. We thus need not and do not decide whether Impossible X's trademark enforcement activities could have any additional relevance in the personal jurisdiction analysis.

## B

Though Impossible X had significant contacts with the forum state, Impossible Foods must still show that its declaratory judgment claims "arise out of or relate to the defendant's contacts" with California. *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017)). In conducting this second prong of the inquiry, "we consider the extent of the defendant's contacts with the forum and the

degree to which the plaintiff's suit is related to those contacts." *Yahoo! Inc.*, 433 F.3d at 1210. A single contact with the forum state may be sufficient to support jurisdiction if the action "arise[s] out of that particular purposeful contact of the defendant with the forum state." *Id*. (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)). Conversely, a stronger showing of purposeful contacts with the forum state "will permit a lesser showing" of relatedness to the litigation. *Id*. That is because a defendant who has more substantially engaged with the forum—such as one who has "continuously and deliberately exploited" the forum state's market—will more reasonably anticipate being subject to personal jurisdiction for causes of action that do not directly arise from those contacts, but that nonetheless "relate to" them. *Ford Motor Co.*, 141 S. Ct. at 1027 (quoting *World-Wide Volkswagen*, 465 U.S. at 781).

The "arising out of or relating to" prong of the specific personal jurisdiction analysis presents a threshold analytical question in this case. In a typical intellectual property action, specific jurisdiction would be based on the defendant's infringing activities in the forum state. *See, e.g.*, *Mavrix Photo*, 647 F.3d at 1229 (finding personal jurisdiction where defendant used "copyrighted photos as part of its exploitation of the California market for its own commercial gain"). In this case, however, we have a trademark declaratory judgment action seeking a declaration of *non*-infringement. This raises the question of what, exactly, the claim could "arise out of or relate to." The parties present different views on that important question.

1

Drawing on Federal Circuit precedent from the patent context, Impossible X argues that a declaratory judgment

action for trademark non-infringement can only "arise out of or relate to" trademark *enforcement activities* in the forum state. The dissent agrees. On this view, Impossible X's trademark building activities and brand development efforts in California are simply irrelevant to the "arising out of or related to" inquiry.

In the case of declaratory judgment actions for patent non-infringement or invalidity, the Federal Circuit has stated that "only those activities of the patentee that relate to the enforcement or defense of the patent can give rise to specific personal jurisdiction for such an action." *Radio Sys. Corp. v. Accession, Inc.*, 638 F.3d 785, 789 (Fed. Cir. 2011). Similarly, in *Avocent Huntsville Corp. v. Aten International Co.*, 552 F.3d 1324 (Fed. Cir. 2008), the Federal Circuit explained that in a declaratory judgment action for patent non-infringement, "a claim neither directly arises out of nor relates to the making, using, offering to sell, selling, or importing of arguably infringing products in the forum, but instead arises out of or relates to the activities of the defendant patentee in enforcing the patent or patents in suit." *Id.* at 1332. By this logic, "[t]he relevant inquiry for specific personal jurisdiction purposes then becomes to what extent has the defendant patentee purposefully directed such enforcement activities at residents of the forum, and the extent to which the declaratory judgment claim arises out of or relates to those activities." *Id.* (quotations and alterations omitted).

Although it identifies no federal court of appeals that has done so, Impossible X argues that we should import the Federal Circuit's approach for patent declaratory judgment actions into the trademark context. Impossible X further maintains that if this approach governs, there can be no personal jurisdiction over Impossible X because its

trademark enforcement activities—the cease and desist letter to Impossible Foods and TTAB opposition—were not directed toward California. (Recall that above, we found purposeful availment/direction based on Impossible X's trademark building efforts in California and did not rely on its trademark enforcement activities.)

We conclude that the Federal Circuit authority on which Impossible X relies does not govern here. We decline to adopt a rigid rule excluding pre-enforcement commercialization activities from consideration in the personal jurisdiction analysis when it comes to declaratory judgment actions for trademark non-infringement. We reach this conclusion for several reasons.

First, even in the patent context, Federal Circuit precedent suggests that courts may not necessarily be constrained to considering only patent enforcement activities in assessing which forum contacts are sufficiently related to the declaratory judgment action. Or, put another way, the Federal Circuit may treat the category of "patent enforcement activities" as broader than simply sending cease and desist letters and the like. Though mere "sales" of products in the forum state will not "support a claim of specific personal jurisdiction over a defendant patentee," *Avocent*, 552 F.3d at 1336, the Federal Circuit's decision in *Avocent*, on which Impossible X principally relies, itself discusses how certain licensing arrangements can support finding personal jurisdiction over patent declaratory judgment defendants. *See id*. at 1334–36 (citing past Federal Circuit precedents); *see also Trimble Inc. v. PerDiemCo LLC*, 997 F.3d 1147, 1155–57 (Fed. Cir. 2021) (noting that "the Supreme Court's recent decision in *Ford* has established that a broad set of a defendant's contacts with a forum are relevant to the minimum contacts analysis," and

considering as part of the specific jurisdiction analysis the defendant's efforts to arrange a patent license with a California company).  Thus, even in the patent context, it is not so clear that the Federal Circuit adheres to a rigid bright-line approach that considers only traditional enforcement activities as part of the "arising out of or related to" inquiry.

Second, and even assuming the Federal Circuit does follow a strict rule that excludes consideration of any commercialization-type activities, that rule is explicitly premised on the nature of patent protection.  The Federal Circuit in *Avocent* specifically explained that forum activities that are unrelated to patent enforcement are irrelevant to specific jurisdiction because they are not related to the disputed patent rights: because a patent creates the right to exclude but not "any affirmative right to make, use, or sell anything," a defendant patentee's sale of products in the forum state "is of no real relevance."  552 F.3d at 1335 (quoting *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 131 F.3d 1011, 1015 (Fed. Cir. 1997)).  As the Supreme Court has explained, "[f]ailure of the patentee to make use of a patented invention does not affect the validity of the patent." *Special Equip. Co. v. Coe*, 324 U.S. 370, 378–79 (1945).  By this logic, in a declaratory judgment action alleging patent non-infringement, a patentee's commercialization of its patented product could be regarded as jurisdictionally inconsequential.

Trademark law is different.  For trademarks, "[u]se, not registration, creates trademark rights and priority."  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:18 (5th ed. 2017).  As we have explained, "[i]t is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).  Thus, "[t]o

acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id.*; *see also, e.g.*, *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1236 (9th Cir. 2022) (citing cases). Our multi-factor test for analyzing trademark infringement, *see AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 350–54 (9th Cir. 1979), accordingly focuses in substantial part on how the mark was used. This critical difference between trademark and patent law suggests we should be reticent to transplant a Federal Circuit approach that is specifically geared to patent law.

Third, if we were to limit the specific jurisdiction inquiry to trademark enforcement activities, as Impossible X suggests, this would invite potential tension with *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), the Supreme Court's most definitive pronouncement on the "arising out of or related to" prong of the specific jurisdiction framework. In *Ford*, the Supreme Court reiterated that "there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id*. at 1025 (quoting *Bristol-Myers*, 582 U.S. at 262). But the nature of that required "affiliation" need not be causal: "None of [the Court's] precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." *Id.* at 1026.

Emphasizing the disjunctive nature of the legal test— "arise out of *or relate to*"—*Ford* explained that while "[t]he first half of that standard asks about causation, . . . the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Id.* The

upshot of this clarification was that Ford was subject to personal jurisdiction in Montana and Minnesota for product liability claims involving automobile accidents in those states—for vehicles that were neither sold, designed, nor manufactured there—based on Ford "systematically serv[ing] a market" in those states through its extensive sales, marketing, and servicing activities. *Id.* at 1028.

Impossible X of course does not enjoy the pervasive relationship with California that Ford, through its national sales and marketing efforts, had with Montana and Minnesota. But the analytical framework that *Ford* provides helps to see why it is error to limit the relevant jurisdictional contacts to those trademark enforcement activities that may have, in a more direct or immediate sense, produced the legal uncertainty that in turn spawned the declaratory judgment action. Such uncertainty is, of course, necessary to establish a concrete dispute, and thus subject matter jurisdiction. *See generally MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). But for personal jurisdiction purposes, the events that ensured the live controversy between the parties do not fully define the scope of the contacts that will be relevant to the underlying dispute over the trademark rights themselves.

The dissent's insistence that we should focus only on trademark enforcement activities and extend the Federal Circuit's approach into the trademark context overlooks this important distinction between subject matter and personal jurisdiction. In claiming that we often borrow from patent law in the trademark context, the dissent improperly relies on portions of the McCarthy treatise and our decision in *San Diego County Credit Union* that concerned Article III jurisdiction, *i.e.*, *subject matter jurisdiction*. *See San Diego Cnty. Credit Union*, 65 F.4th at 1030; McCarthy, *supra*, § 32:50. As we have just explained, to ensure an actual

controversy (subject matter jurisdiction) between the parties in a declaratory judgment action, the dispute must be "of sufficient immediacy." *MedImmune*, 549 U.S. at 127 (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). But the events that produce that required immediacy (such as trademark enforcement activities) do not ringfence the facts (and thus the jurisdictional contacts) that will be relevant to the substance of the parties' underlying dispute.

Given trademark law's focus on trademark *use*, McCarthy, *supra*, § 16:18; *Sleekcraft Boats*, 599 F.2d at 350–54, trademark usage is central in evaluating trademark *rights*. Consistent with *Ford*, an action seeking a declaration of trademark non-infringement can thus arise out of, or at the very least relate to, trademark building activities in a forum state. To the extent the relationship between these trademark building activities and a later trademark declaratory judgment action is not strictly causal, *Ford* confirms that is not strictly required. 141 S. Ct. at 1026.

The dissent is thus clearly wrong in suggesting that under our decision today, a plaintiff like Impossible Foods could bring a declaratory judgment action like this one without any material threat of an enforcement action by the defendant. We of course hold no such thing. In a declaratory judgment action, sufficient immediacy of dispute (which exists here) remains a requirement for Article III jurisdiction. *See MedImmune*, 549 U.S. at 127. But the actions that generate that immediacy do not thereby demarcate the contacts relevant to a personal jurisdiction analysis of the parties' actual dispute on the merits. This is true not only as a matter of logic, but of law. In a declaratory judgment for breach of contract, for example, a letter accusing one party of breach could create the immediacy required for Article III

jurisdiction. But we would not limit ourselves to the circumstances surrounding that letter in defining the relevant contacts for specific personal jurisdiction purposes, while ignoring the whole of the parties' relationship. *See Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015) (explaining that, in a declaratory judgment action for breach of contract, the specific jurisdiction inquiry extends to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" (quoting *Burger King*, 471 U.S. at 479)). In this case, we have simply applied that same basic approach to trademark declaratory judgment actions, because, unlike patents, trademark rights turn on use, and personal jurisdiction requires that we "comprehensively evaluate the extent of the defendant's contacts with the forum state and those contacts' relationship to the plaintiffs' claims." *Davis*, 71 F.4th at 1162.

Finally, we note that at least one other circuit addressing personal jurisdiction in a trademark declaratory judgment action did not follow the rigid approach that Impossible X puts forth. In *CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir. 1996), the Sixth Circuit concluded that a trademark declaratory judgment action defendant was subject to specific jurisdiction in Ohio when he had marketed his software product exclusively on the plaintiff's Ohio-based server system. It reasoned that the declaratory judgment action arose, in part, out of these contacts, because "any common law trademark or trade name which [the defendant] might have in his product would arguably have been created in Ohio." *Id*. at 1267. The Sixth Circuit did not limit its inquiry to trademark enforcement-type conduct.

For these reasons, we do not confine our analysis under the "arising out of or related to" prong to Impossible X's

trademark enforcement activities.  To the extent the Federal Circuit follows such an approach for patent declaratory judgments, that approach is not justified in the trademark context, given the differences between patent and trademark rights.

2

Having rejected Impossible X's strict enforcement-actions-only approach, we now consider whether Impossible Foods' trademark declaratory judgment action arises out of or relates to Impossible X's contacts with California.  We conclude that it does.  Impossible Foods' declaratory judgment action requires an assessment of the parties' respective rights in the IMPOSSIBLE mark.  Under trademark law, those rights are based on when and how the trademark holder used the mark.  Impossible X's trademark building activities in California are thus integral to the scope of the rights that are to be declared in this case.  Those activities have a sufficient nexus to this dispute to satisfy due process.

In its complaint, Impossible Foods sought "a declaration that its use and registration of the trademark IMPOSSIBLE in connection with recipes, food ingredients, and cooking information" did not infringe on Impossible X's trademark rights.  Impossible Foods' complaint extensively discussed Impossible X's TTAB notice of opposition, which is what prompted Impossible Foods to take legal action.  In that opposition, Impossible X made broad claims about its rights to the IMPOSSIBLE mark.  It asserted, for example, that since 2010, it "has continually used the [IMPOSSIBLE] mark . . . to provide a wide range of goods and services, including apparel, fitness products, nutritional supplements, consulting services, and philanthropic services."  Impossible

X also made other expansive assertions about its use of the mark since 2010 for "nutrition, food, and cooking" purposes, as well as in connection with clothing and personal fitness. According to Impossible X, these uses of the mark were all "longstanding and continuous."

Impossible X's far-reaching TTAB opposition puts at issue the full extent of Impossible X's use of the IMPOSSIBLE mark, including as to food and nutrition, the apparent core of the parties' current dispute. To evaluate Impossible X's claimed rights in the mark, one must evaluate its *use* of the mark. *See, e.g.*, McCarthy, *supra*, § 16:18; *Sleekcraft Boats*, 599 F.2d at 350–54. Although trademark registration (which is not mandatory) "constitutes 'prima facie evidence' of the mark's validity" and confers other "valuable benefits," *Iancu v. Brunetti*, 139 S. Ct. 2294, 2297 (2019) (quoting 15 U.S.C. § 1115(a)), "only use in the marketplace can establish a mark." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 979 (9th Cir. 2006). This analysis requires consideration of factors such as the "use and function" of the mark and how it is "generally used." *Sleekcraft Boats*, 599 F.2d at 349–50; *see also San Diego Cnty. Credit Union*, 65 F.4th at 1035 (explaining for personal jurisdiction purposes that a declaratory judgment plaintiff's claims for non-infringement "arose out of" the defendant's "use of its trademarks in California because those are the very same trademarks" that the defendant "used to attack [the plaintiff's] trademark registration in the TTAB proceedings").

In this case, a core situs for Impossible X's trademark building and trademark use was California, which for approximately two years was the "hq" and "base point" for Impossible X and Runyon. Any assessment of Impossible X's assertions in its TTAB opposition about its use of the

mark will require consideration of the company's activities in California. Indeed, much of the apparent value of Impossible X as an entity would appear to consist of the assertedly powerful nature of its brand. Impossible Foods has fairly demonstrated that California is where Runyon most clearly endeavored to develop brand recognition, in some instances by explicitly tying the ethos of the IMPOSSIBLE mark to California itself.

The California contacts we set forth above in detail are relevant to an assessment of Impossible X's trademark usage, and thus to its claimed rights in the IMPOSSIBLE mark. That includes Impossible X's use of the mark in the sphere of food and nutrition—the very area in which Impossible Foods claims superior rights in the mark. Because Impossible Foods' declaratory judgment action sufficiently "arises out of or relates to" Impossible X's trademark building activities in California, we have no need to consider whether Impossible X's trademark enforcement activities could provide additional support for asserting specific personal jurisdiction over Impossible X.

The dissent argues that the clear relationship between Impossible X's trademark-building activities and this declaratory judgment action is not enough for specific jurisdiction because, even after *Ford*, a plaintiff is still required to show "*some* causal nexus." This squarely contradicts *Ford*'s statement that "some relationships will support jurisdiction without a causal showing." 141 S. Ct. at 1026. As we have explained, after *Ford* "a claim can relate to" a defendant's forum contacts "even absent causation." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 505

(9th Cir. 2023).[2]  Through the application of rigid patent-based rules that have no proper application here, the dissent simply ignores Impossible X's extensive contacts with California and their direct relationship to the trademark rights that are at issue in this case.

We of course agree that the phrase "related to" "incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford*, 141 S. Ct. at 1026. The "arising out of" inquiry demands similar care.  Our holding here thus does not mean that simply any sales and marketing activities will create specific personal jurisdiction in a declaratory judgment action for trademark non-infringement.  We certainly do not suggest that a company like Impossible X could be subject to specific jurisdiction in all fifty states in a trademark declaratory judgment action merely because its social media self-promotion is beamed out through nationwide online marketing efforts.  Impossible X argues this will be the implication of our reliance on its trademark building activities, but it is mistaken.  There is an obvious difference between undifferentiated nationwide sales and marketing efforts and what we have here: Impossible X for a substantial period of time using California as its "base point" and "headquarters" to build the

---

[2] The dissent cites several cases from other circuits in support of its claim that "*some* causal nexus" is required.  If anything, these cases prove the opposite.  *See, e.g.*, *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1222 (10th Cir. 2021) (noting that, in *Ford*, "the Supreme Court made clear that a causal connection is not required").  What these cases do support is the general proposition that "relatedness" does not mean "anything goes," and that courts must carefully apply due process principles to determine when conduct is sufficiently affiliated with the "forum and the underlying controversy" to establish personal jurisdiction.  *Ford Motor Co.*, 141 S. Ct at 1026 (internal quotations omitted).  Our analysis is entirely consistent with that directive.

brand and establish the asserted legal rights that are at the center of this dispute.

Impossible X is likewise wrong in arguing that finding specific jurisdiction here will collapse the distinction between specific and general jurisdiction. Our analysis does not blur that important distinction. This case presents the specific situation of a company and its sole member who were previously based in California, went "nomadic," and then resettled elsewhere. Although the contacts we have relied upon would be relevant to a general jurisdiction analysis should Impossible X have stayed in San Diego, that it pulled out of California does not mean those same contacts are somehow irrelevant when it comes to specific jurisdiction. It is hardly surprising that a company could be subject to suit in the forum in which it was previously headquartered. At the same time, we do not suggest that Impossible X is subject to personal jurisdiction in California for any and every lawsuit. Nor do we hold, as the dissent claims, that "any company that has past business-generating activities in a state" will always be subject "to specific jurisdiction in that state for a trademark declaratory judgment action." We simply hold that given the nature of this declaratory judgment action—as teed up through Impossible X's TTAB opposition—and considering Impossible X's substantial contacts with California, there is a sufficient "affiliation between the forum and the underlying controversy." *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Bristol-Myers*, 582 U.S. at 262).

Impossible X finally argues that if we find personal jurisdiction here, trademark holders could be subject to specific jurisdiction in trademark declaratory judgment actions for any past trademark building activities, however remote in time. Impossible X's concerns are again

substantially overstated.  Even if the first two prongs of the specific jurisdiction inquiry are met, the assertion of personal jurisdiction must still be reasonable.  *See, e.g.*, *Axiom Foods*, 874 F.3d at 1068.  That is the import of the third prong of the specific jurisdiction inquiry, which we address in more detail below.  But suffice it to say, a trademark declaratory judgment defendant whose forum-related activities (or whose predecessor's forum-related activities) are either fleeting or relics of a distant past may well have arguments that haling it into the forum is unreasonable.  We do not hold that Impossible X or any trademark holder is subject to specific jurisdiction until the end of time for any trademark declaratory action in a situs of trademark development.  That is neither a necessary implication of our ruling today nor the facts of the case before us.

For these reasons, we hold that Impossible Foods' declaratory judgment action "arises out of or relates to" Impossible X's activities in California.

3

The district court took a narrower approach to the "arising out of or related to" inquiry, and we pause to explain why its analysis was mistaken.

As recounted above, the district court found that Impossible X had purposefully directed its activities toward California based on its trademark building and commercialization efforts there.  But the court concluded that this dispute did not arise out of or relate to those contacts based on a purported timing issue: Impossible Foods did not begin to use the IMPOSSIBLE mark in commerce until June 2016, and Runyon had left San Diego by that time.  In the district court's view, this meant that the earliest point at

which this dispute could arise was June 2016, rendering irrelevant Impossible X's earlier trademark building activities in California.

This analysis was erroneous. Even assuming the district court correctly determined that Impossible Foods' trademark usage did not commence until June 2016, after Runyon (mostly) left San Diego—a point Impossible Foods strongly disputes—that does not render Impossible X's pre-June 2016 California activities irrelevant to the "arising out of or related to" inquiry. The question for personal jurisdiction purposes is whether the plaintiff's claims "'arise out of or relate to the *defendant's contacts*' with the forum." *Ford Motor Co.*, 141 S. Ct. at 1025 (emphasis added) (quoting *Bristol-Myers*, 582 U.S. at 262). Here, Impossible Foods' claims turn on the scope of Impossible X's trademark rights, which in turn hinge on Impossible X's use of the IMPOSSIBLE mark. For the reasons we have explained, Impossible X's trademark building efforts in California bear on its use of the mark and thus the scope of its rights. That some of Impossible X's forum-related contacts may have preceded Impossible Foods' own trademark registration and usage in commerce does not mean this dispute fails to arise out of or relate to those contacts. From the perspective of both personal jurisdiction and trademark law, it is incorrect to conceive of this case as limited to *Impossible Foods'* use of the IMPOSSIBLE mark.

Any ironclad personal jurisdiction timing rule based on Impossible Foods' own trademark registration or usage is thus unsupported. And to the extent the district court's analysis can be read to suggest that Impossible X's jurisdictionally relevant contacts could be only those relating to its trademark enforcement activities, that reasoning is flawed for the reasons we explained above.

C

We now turn to the third and final prong of the specific jurisdiction analysis. Because Impossible Foods has demonstrated that Impossible X purposefully directed its activities toward California and that this declaratory judgment action arises out of or relates to those contacts with the forum state, the burden now "shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Axiom Foods*, 874 F.3d at 1068–69 (quotations omitted). The district court did not reach this part of the inquiry. But the analysis here is straightforward: Impossible X has not shown that exercising specific jurisdiction over it in California would be unreasonable, much less presented a "compelling case" as to why that would be so.

We evaluate the reasonableness of exercising personal jurisdiction by evaluating the following factors:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Freestream Aircraft*, 905 F.3d at 607. These factors either favor Impossible Foods or are neutral at best.

The extent of the defendant's "purposeful interjection" into the forum "is 'analogous to the purposeful direction' factor.'" *Ayla*, 11 F.4th at 984 (quoting *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988)). On this front, personal jurisdiction is reasonable in California for the same reasons we articulated above. Impossible X purposefully interjected itself into California by operating its business there for two years and by continuing to have business contacts with the state thereafter, including through brand-marketing activities featuring California. Impossible X is no stranger to California. As a company previously headquartered there, it can hardly feign surprise at being called back to the state when a dispute has arisen relating to its activities in the forum.

Nor has Impossible X shown that litigating this action in California would be unduly burdensome, such that the "inconvenience is so great as to constitute a deprivation of due process." *Freestream Aircraft*, 905 F.3d at 608 (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998)). Undermining any assertion of inconvenience, Runyon has made many trips to California since relocating, including in connection with his work for Impossible X. In any event, we have recognized that "modern advances in communications and transportation have significantly reduced the burden of litigating in another forum." *Id.* (alterations omitted) (quoting *Sinatra*, 854 F.2d at 1199). There is no reason to think this case will be any different.

The remaining reasonableness factors either favor California as a forum, or at the very least do not present a "compelling case" against it. California likely has a stronger interest in this dispute than Texas, and litigating this case in California would seem more efficient. But even if there are arguments otherwise, the balance of the reasonableness

factors supports Impossible Foods.  Impossible X has not met its burden of demonstrating that exercising personal jurisdiction against it in California would be unreasonable.

*          *          *

We hold that Impossible X is subject to specific personal jurisdiction in California in this trademark declaratory judgment action.  The judgment of the district court is reversed, and the case is remanded for consideration of the merits of Impossible Foods' claims.

**REVERSED.**

VANDYKE, Circuit Judge, dissenting:

Impossible X has not purposefully directed any trademark enforcement activity at California, and Impossible Foods's declaratory judgment action does not arise out of or relate to Impossible X's relevant activities in California.  Yet the majority concludes that a California court nevertheless has specific jurisdiction over Impossible X because it once operated out of California and has had occasional contacts with the state since relocating to Texas years before this dispute arose.

The majority's rule, which reconceptualizes specific jurisdiction as a kind of backward-looking "general jurisdiction lite," pushes our precedent in a new and troubling direction.  Carried to its logical conclusion, today's ruling subjects any company that has past business-generating activities in a state to specific jurisdiction in that state for a trademark declaratory judgment action—notwithstanding the complete absence of any trademark

enforcement activities directed at that state. The majority insists its new rule shouldn't be applied that way. But it provides no reason why it should be artificially limited or where those artificial lines should be drawn, leaving lower courts and litigants guessing. I wouldn't reach the difficult question decided by the majority today because Impossible Foods affirmatively waived it in the court below. But if I was forced to reach it, I would instead apply a different and more concrete rule than the one created by the majority— one we already apply in the admittedly imperfectly analogous field of patent law—to hold that specific jurisdiction for a trademark declaratory judgment action like this exists only if a defendant purposefully directs at least one enforcement activity at the forum. I thus respectfully dissent.

## DISCUSSION

### I. The Majority Bases Its Finding of Specific Jurisdiction on an Argument Impossible Foods Waived.

Impossible Foods did not raise before the district court any argument that Impossible X's brand-building activities provide an independent basis for specific jurisdiction. But on appeal Impossible Foods recasts scattered statements it made below, about how a history of those activities would make exercise of jurisdiction *reasonable* under the third *Schwarzenegger* prong, as arguments it purportedly made that jurisdiction *exists* under the first and second *Schwarzenegger* prongs. That sleight of hand misleads the majority, none of whose four reasons for concluding that Impossible Foods preserved the argument survives close scrutiny.

### A. Impossible Foods did not raise before the district court, and in fact disavowed, an argument that Impossible X's brand-building activities create specific jurisdiction.

In its opposition to Impossible X's motion to dismiss, Impossible Foods identified only Impossible X's trademark enforcement activities as relevant to the first two prongs of the *Schwarzenegger* jurisdictional analysis because it was those activities that "threatened to limit [Impossible Foods's] ability to grow aspects of its business in California and to disrupt certain marketing and promotional activities" there. "Plaintiff's request for declaratory relief would not have been necessary," Impossible Foods's counsel advised the district court, "*but for*" the cease-and-desist letter, trademark opposition proceeding, and failure of settlement negotiations. (Emphasis added.)

That exclusive reliance on enforcement activities continued at the motion hearing, where Impossible Foods's counsel identified only the cease-and-desist letter, the trademark opposition proceeding, and settlement discussions as "plainly direct[ed] to the State of California." Even though the district court twice opined that those enforcement actions alone might be insufficient to create jurisdiction and invited Impossible Foods to elaborate on or clarify its argument, Impossible Foods doubled down, averring that "a claimant who proactively and emphatically asserts [trademark] claims in this manner, and plainly directs them to the State of California, should reasonably expect to be hauled into court here." Asked by the district court to clarify whether counsel's statement "asserts claims in this manner" referred to the abovementioned enforcement activities, counsel answered in the affirmative.

Lest there be any lingering doubt about the scope of its argument, Impossible Foods's counsel later in the hearing emphasized that "on this notion of purposeful direction … [t]he triggering acts are the cease and desist letter … the legal proceeding at the TTAB, and the discussions that follow." Counsel opined that Impossible Foods's exclusive reliance on those enforcement activities had been "very clear" from the start of litigation, with any references by it to brand-building activities intended simply to provide "context" relevant to the third prong of the *Schwarzenegger* jurisdictional analysis—that is, whether any exercise of jurisdiction would be reasonable. And when the district court responded that such "reasonableness" considerations under the third *Schwarzenegger* prong couldn't be considered under "elements one and two" of the *Schwarzenegger* test, Impossible Foods responded, "I think that's fair, your Honor," and continued to rely on Impossible X's enforcement activities. In short, Impossible Foods was "very clear" in representing to the district court that it was relying only on Impossible X's enforcement activities for the first two prongs of the *Schwarzenegger* analysis.

Our court generally declines to consider an argument that a party did not sufficiently raise before the trial court. *See All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 488 (9th Cir. 2023). And here, Impossible Foods did not simply fail to make an argument below that Impossible X's brand-building activities provided a basis for jurisdiction; it expressly disavowed that argument when asked by the district court, emphasizing that it was relying exclusively on enforcement activities.

**B. Impossible Foods misleads the majority into finding an absence of waiver.**

That "very clear" argument failed below, however, and hasn't gotten much traction with our court either. So Impossible Foods tries to confuse us with a shell game, claiming in the alternative that the statements it made below about Impossible X's brand-building activities under the third prong of the *Schwarzenegger* jurisdictional analysis can also be deemed to have been made with respect to the first two prongs and were thus preserved. The majority today falls for that backup ploy, beguiled by two misperceptions of reality. *First*, the majority ignores something right before its eyes: the multiple times that Impossible Foods disavowed the argument it now claims to have preserved. *Second*, the majority sees something not there, claiming that Impossible Foods is now simply "elaborating upon and prioritizing an argument based on trademark building it raised below."

That second misperception seems at least partly induced by the majority's misunderstanding of what it means under our precedent for a party to elaborate on or prioritize an argument it previously made in the district court. The case the majority relies on illustrates the common-sense limitations on what properly constitutes mere "elaboration," as opposed to making a new argument on appeal. In *Puerta v. United States*, we permitted a party to "elaborate" on a statutory argument it made in district court with additional support from the statute's legislative history. 121 F.3d 1338, 1341–42 (9th Cir. 1997). None of our cases citing *Puerta* has read that case to stand for the much more ambitious proposition that a party "elaborates upon" an argument when it makes an argument for the first time on appeal after

disclaiming it below.[1]  *Puerta* would be more like this case if the party had expressly disclaimed any reliance on the legislative history in the district court, and then on appeal attempted to rely primarily on legislative history.

That is fatal for the majority's position because Impossible Foods never made *any* argument below that Impossible X's brand-building activities provide an independent basis for jurisdiction.  The majority tries to resuscitate the position in four different ways, principally by quoting scattered phrases in the record.  But those attempts quickly flatline once those quotes are examined in context.

### C.  None of the four arguments the majority offers to support its conclusion of nonwaiver survives scrutiny.

*First*, the majority maintains that Impossible Foods mentioned in its opposition to the motion to dismiss that "Impossible X's California business activities were relevant both to the 'purposeful direction/availment' and the 'arising out of/related to' prongs of the specific jurisdiction analysis."  But the majority fails to recognize that surrounding sentences and Impossible Foods' other more specific explanations mentioned above compel the conclusion that it instead invoked those business interests merely to support its argument that jurisdiction arose from Impossible X's trademark-enforcement activities.

---

[1] The majority appears to understand *Allen v. Santa Clara County Corrections Police Officers Association*, 38 F.4th 68 (9th Cir. 2022) (per curiam), to break from this precedent, but it does not.  There, the plaintiffs were responding to an intervening change in Supreme Court precedent, and even then did not attempt to present an argument on appeal that they had affirmatively disclaimed before the district court. *Id.* at 70–71.

Impossible Foods had just noted that its "request for declaratory relief would not have been necessary *but for*" those enforcement activities.  And the rest of the sentence from which the majority quotes clarifies that Impossible X's brand-building activities merely accentuate the reasonability of exercising jurisdiction based on enforcement actions: the "relationship between the forum state and the defendant's *enforcement actions* is *heightened* when the defendant has business interests in the forum state."

*Second*, the majority says that Impossible Foods argued in the motion hearing that "Impossible X's business activities in California were supportive of specific jurisdiction, emphasizing that California was 'where the trademark is located,' where Runyon had 'operated his business historically,' and where he 'has had routine and systemic contacts.'"  But the majority mischaracterizes the colloquy between the district court and Impossible Foods, during which Impossible Foods repeatedly stated or affirmed that Impossible X's enforcement activities provide the basis for specific jurisdiction.  Impossible Foods offered that Impossible X's brand-building activities in California offer "a rich history of forum *context* going back a decade."  But it then zagged back to its affirmative point that it was the enforcement activities that create jurisdiction.  As Impossible Foods put it at the hearing, "I would say fundamentally, on personal jurisdiction, your Honor, there are three points"—all three of which Impossible Foods then identified as enforcement activities.

*Third*, the majority combines scattered phrases from three pages of that same colloquy to conclude that Impossible Foods pointed to nonenforcement activity to establish jurisdiction, "including 'a rich history of forum context going back close to a decade' and 'online evidence

of blog posts and social media posts.'"  Context shows the opposite is true: Impossible Foods noted Impossible X's "rich history of forum context" as it *forwent* an opportunity the district court had just offered it to argue that specific jurisdiction could arise from "the conduct of the parties" before the initiation of enforcement proceedings.  And even when the district court subsequently interjected that Impossible X's enforcement activities alone "would not be enough" to establish jurisdiction, Impossible Foods resisted that conclusion rather than expanding the scope of its jurisdictional argument to include nonenforcement activities.  Because the majority misrepresents that crucial exchange, it is worth quoting in full:

> **The Court:** So let's remember though, Mr. Slafsky, for specific jurisdiction it has to be contacts with the forum related to the case before me, because otherwise [counsel for Impossible X] is correct, that veers into the elements of general jurisdiction.
>
> **Mr. Slafsky:** I think we have been very clear in our papers, your Honor, that we are arguing specific jurisdiction.
>
> **The Court:** Yes, you have but this evidence—
>
> **Mr. Slafsky:** The triggering acts are the cease and desist letter—
>
> **The Court:** Right.
>
> **Mr. Slafsky:** —the legal proceedings at the TTAB, and the discussions that follow.  So those together have to be looked at in the

context of this larger history.  There's a third prong under the *Schwarzenegger* case that the Ninth Circuit has issued on the specific jurisdiction analysis.  That reasonableness, that fairness prong, is not something that we just throw to the wayside.

In short, Impossible Foods argued (1) specific jurisdiction (2) is based on Impossible X's enforcement activities, and (3) Impossible X's brand-building activities served as "the context of this larger history" for purposes of analysis under the third *Schwarzenegger* prong.

*Fourth*, perhaps sensing the infirmity of its identified bases for finding that Impossible Foods did not waive this argument, the majority alternatively concludes that even if Impossible Foods did not make the argument below, the district court still considered it, examining "'general business contacts'" of Impossible X in California as "an independent basis for personal jurisdiction."  But the majority tellingly does not offer any quotes from the district court order supporting that conclusion.  It instead gestures widely to six pages of the district court's order where it supposedly "explain[ed] why Impossible X's trademark building contacts were sufficient to establish purposeful direction/availment, yet insufficient to meet the 'arising out of or relating to' inquiry."  But nothing in that page range supports that conclusion.  It is true that the district court *mentions* Impossible X's brand-building activities at some points.  But it does so only as an aside, noting that Impossible Foods had merely "identified" these other activities and acknowledging what Impossible Foods itself already had

acknowledged: that its declaratory judgment claim did *not* "arise out of" those activities.[2]

## II. Even Ignoring Waiver, None of Impossible X's Relevant Activities Were Purposefully Directed at California.

Putting aside the majority's error about waiver, its conclusion is also erroneous because Impossible Foods did not carry its burden to show that Impossible X purposefully directed any suit-related activities at California. That is, it failed to show that Impossible X (1) committed an intentional act (2) expressly aimed at California (3) that caused harm Impossible X knew was likely to be suffered there. *Will Co., Ltd. v. Lee*, 47 F.4th 917, 922 (9th Cir. 2022).

The majority does not rely on any of Impossible X's *enforcement* activities as purposefully directed at California. And for good reason. Impossible X's cease-and-desist letter was not sent or received in California. Opposition proceedings were not initiated there and concerned Impossible Foods's operations nationwide. *See San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65

---

[2] Because the district court did not consider Impossible X's California general business activities as an independent jurisdictional basis, the majority's reliance on *Community House, Inc. v. City of Boise* is inapposite. Our court there held only that a district court "considered and resolved" an argument when it analyzed precisely the argument the party wished to newly argue against on appeal. 490 F.3d 1041, 1054 (9th Cir. 2007). Panels applying *Community House* have not diverged from this straightforward interpretation. *See, e.g.*, *Tarabochia v. Adkins*, 766 F.3d 1115, 1128 & nn.12–13 (9th Cir. 2014).

F.4th 1012, 1035 (9th Cir. 2023).    And settlement discussions were not initiated in California.[3]

Instead, the majority concludes that Impossible X's *non-enforcement* activities alone satisfy *Lee*'s requirement that Impossible X purposefully directed suit-related activities at California knowing those activities were likely to cause trademark-related harm in California.  The activities the majority relies on include a number of Instagram posts with California-themed hashtags, and sporadic consulting and networking trips the company's owner took to California years before any trademark enforcement activities began. But such general business activities, even if they were more plentiful, should not count under this prong because they significantly predated and are unconnected with the instant controversy—and absent a crystal ball, could not have been directed at the forum in a way Impossible X knew would likely create future harm there.  *See Lee*, 47 F.4th at 922–23. Such purposeful direction could exist only alongside *some* anticipated or actual enforcement action aimed at California.

The majority doesn't rely exclusively on Impossible X's past brand-building activities in California, though.    It repeatedly references that Impossible X and its owner used to be "based in California."  Indeed, the reason Impossible X had "brand-building" activities in California during that time is because, as the majority observes, that is where

---

[3] Even assuming that Impossible Foods felt effects from these enforcement activities at its headquarters in California, our precedent is clear that is irrelevant absent evidence (never offered) that Impossible X conducted its enforcement activities *outside* California for the very purpose of achieving those effects *inside* California.  *Burri Law PA v. Skurla*, 35 F.4th 1207, 1259–60 (9th Cir. 2022).

owner "Runyon—and by extension, Impossible X"—was spending much of his time.

But the majority's reliance on the existence of past *general* jurisdiction over Impossible X in California as a reason to find *specific* jurisdiction in this case is without precedent.  It is also potentially the most radical reimagining and expansion of specific jurisdiction in decades.  Many corporations change their state of incorporation or principal place of business sometime during their lifecycle.  For instance, Mark Zuckerburg first launched Facebook from his Harvard dorm in Massachusetts and first incorporated it in Florida before decamping for the company's current headquarters in California.  Under the majority's use of past general jurisdiction to bolster current specific jurisdiction, Massachusetts and Florida could now effectively exercise a form of specific jurisdiction over any of the social media giant's global operations.  The majority seems at least faintly aware that its theory has no objective limiting principle, and it does not meaningfully try to offer one even though the theory would make it nigh impossible for at least some defendants to "structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

In any event, the majority's reliance on past general jurisdiction to bolster an insufficient basis for specific jurisdiction is foreclosed by Supreme Court precedent.  A forum has general jurisdiction only over a defendant whose affiliations with it "are so continuous and systematic as to render him essentially at home" there.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  Until today, we have understood the Supreme Court's consistent use of the present tense and the word

"continuous" when describing those affiliations to be intentional, always looking at whether a defendant *presently* has systematic affiliations with a forum.  *E.g.*, *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 503 (9th Cir. 2023); *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1020–22 (9th Cir. 2017); *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069–71 (9th Cir. 2015).   The majority diverges from that position today without offering an explanation for its expansion.[4]

Perhaps sensing the inherently weak basis for purposeful direction in this case, the majority attempts to salvage its conclusion here by enlisting the purposeful availment test also, even as it concedes that our court has generally stuck to the purposeful direction test in trademark infringement cases.  The majority finds authorization for this syncretism in one of our recent cases where we observed that we "have specifically recognized that 'our cases do not impose a rigid

---

[4] The majority's novel expansion of specific jurisdiction in this manner continues a disturbing streak by our court as it has floated novel theories to expand jurisdiction beyond the limits set by the Supreme Court. Consider for example *Daimler AG v. Bauman*, 571 U.S. 117, 136 (2014). There, a panel of our court held that U.S. federal courts had general jurisdiction over a German carmaker for its Argentinian subsidiary's alleged activities in Argentina just because the carmaker also had a separate U.S.-based subsidiary. *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909 (9th Cir. 2011).  Eight members of our court, dissenting from denial of rehearing en banc, noted that the panel had stretched general personal jurisdiction "far beyond its breaking point" and that this "affront to due process" was "at odds again with the dictates of the Supreme Court" and "ignore[d] the bedrock concerns of fundamental fairness that underpin Supreme Court due process jurisprudence." *Bauman v. DaimlerChrysler Corp.*, 676 F.3d 774, 774–77 (9th Cir. 2011) (mem) (O'Scannlain, J., dissenting).  The Supreme Court agreed, reversing our court's theory as "beyond even the 'sprawling view of general jurisdiction' [the Supreme Court] rejected in *Goodyear*." *Daimler AG*, 571 U.S. at 136 (quoting *Goodyear*, 564 U.S. at 929).

dividing line' between purposeful availment and purposeful direction.'"   The majority also points to language from another recent case where we said that "there's no need to adhere to [this] iron-clad doctrinal dichotomy' in every case."

The majority misreads those cases.  *Global Commodities* reaffirms that "purposeful availment and purposeful direction are distinct concepts," noting only that a court should not impose a rigid dividing line between the two "when both contract and tort claims are at issue," i.e., when the two kinds of claims are intertwined and depend on the same set of facts in a single case.  972 F.3d at 1107.  The cases *Global Commodities* cites in support make clear that flexibility is required to accommodate the reality of how contracts operate—usually creating an intention of continuing relationships and obligations with a forum before any specific activity is purposefully directed at the forum. *E.g.*, *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008).  Such intertwined claims are not present in this case, and none of Impossible X's sporadic activities in California even hints at a similar degree of anticipated future relationships or obligations of Impossible X vis-à-vis California.

### III. Impossible Foods's Declaratory Judgment Action Did Not Arise out of or Relate to Impossible X's Relevant Activities.

If the majority's analysis of waiver and the first *Schwarzenegger* prong were correct (it is not), the second *Schwarzenegger* prong would still require us to affirm the district court's dismissal of this case.  That prong requires the activities purposefully directed at a forum to be the ones that "give rise to the liabilities sued on."  *Int'l Shoe Co. v.*

*Washington*, 326 U.S. 310, 317 (1945).  In other words, there must be a "strong connection" between the purposefully directed activities and the alleged harm that triggered the suit.  *Hepp v. Facebook*, 14 F.4th 204, 208 (3d Cir. 2021); *see also LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 864 (9th Cir. 2022).

Impossible X's non-enforcement activities cannot create such a strong connection on their own because the harm that triggers a declaratory judgment action in a trademark enforcement case is a plaintiff's real and reasonable apprehension that it will be liable for infringement absent that relief.  *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007).[5]  Given the many similarities between trademark and patent law, our court "regularly borrow[s]" and reasons analogically from the latter to the former, *San Diego Cnty. Credit Union*, 65 F.4th at 1030–31 & n.8, and patent cases leave no doubt that only "an affirmative act … relating to the enforcement of … patent rights" creates such apprehension, *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1377 (Fed. Cir. 2012).  Non-enforcement activities do not.  *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1341 (Fed. Cir. 2008).

The majority maintains that we should ignore the regular practice in patent cases here because trademark rights are created by use, whereas patent rights are created by registration.  The very treatise from which the majority scaffolds this argument considers that difference unimportant at least for subject-matter jurisdiction for declaratory judgment actions, freely drawing conclusions

---

[5] Because Impossible X's enforcement activities do not qualify as purposefully directed at California under the first *Schwarzenegger* prong, they need not be analyzed here under the second prong.

about requirements in trademark declaratory judgment actions from analogies to patent cases. *See* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:50 (5th ed. 2023). And we rely on analogies between patents and trademarks in other contexts as well. *San Diego Cnty. Credit Union*, 65 F.4th at 1030 n.8 ("We regularly borrow on principles from patent cases to guide our analyses in trademark cases.").

But even assuming the difference the majority highlights is meaningful in analysis of personal jurisdiction, it hardly follows that the difference annuls the analogy such that we should ignore the rule from patent cases altogether. After all, even acknowledging that use matters more in a trademark enforcement case than it does in a patent enforcement case, that doesn't mean *no amount of* enforcement activity is necessary for a plaintiff in a trademark case to be reasonably apprehensive that it could be liable for infringement. If it did, our court's discussion in *San Diego County Credit Union* and elsewhere as to what *degree* of enforcement activity is enough to create reasonable apprehension would be nonsensical. *See* 65 F.4th at 1030–31. And it would mean a plaintiff like Impossible Foods could bring a declaratory judgment action like this one without any enforcement action by the defendant.

In short, in contrast to patent cases, there may be more of a reason to consider non-enforcement activity as *part* of the specific jurisdiction analysis in trademark cases. But there is no reason to jettison entirely, as the majority does here, consideration whether the enforcement activity has any relation to the declaratory judgment jurisdiction.

The majority also divulges a fear that following the analogy to patent jurisdiction to its logical conclusion and

then exercising the self-discipline to require the mandatory strong connection to enforcement activities "invite[s] potential tension with" *Ford Motor Company v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), which held that this second jurisdictional prong does not always require "a strict causal relationship between the defendant's in-state activity and the litigation." But that fear results from an unbalanced reading of *Ford Motor Company*, which also strenuously reminded us that the second prong still "incorporates real limits, as it must to adequately protect defendants foreign to a forum." 141 S. Ct. at 1026; *accord County of San Mateo v. Chevron Corp.*, 32 F.4th 733, 754 n.12 (9th Cir. 2022).

Our court until today has understood those "real limits" to require a plaintiff to show *some* causal nexus—even if not a strict one—between activities and harms alleged to have arisen from or to be related to the activities.[6]  *E.g.*, *LNS*

---

[6] The majority argues that *Ford* did away with the need for any causal nexus at all between activities and the harms alleged to have arisen from them.  In the majority's view, the need for some nexus "squarely contradicts *Ford*'s statement that 'some relationships will support jurisdiction without a causal showing.'"  As evidence, the majority points to *Yamashita*, where we recently said that "a claim can relate to a defendant's forum contacts 'even absent causation.'"

The majority again is misled by not reading language it quotes in context. *Yamashita*'s discussion of the Supreme Court's reasoning in *Ford* quickly disabuses one of any notion that no causal connection at all is needed between a defendant's activity and a plaintiff's alleged injury. The *Yamashita* court understood *Ford* to stand for the proposition that, given Ford's extensive contacts with the forum states, a causal connection "may well have" existed between those contacts and the plaintiffs' decision to buy Ford vehicles that then malfunctioned and caused them injuries.  62 F.4th at 505.  "Given the likelihood of

*Enters. LLC*, 22 F.4th at 863–64.  At least six sister circuits have agreed with that position.  *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 252, 261 (1st Cir. 2022); *Johnson v. TheHuffingtonPost.com*, 21 F.4th 314, 324–25 (5th Cir. 2021); *In re Sheehan*, 48 F.4th 513, 526 (7th Cir. 2022); *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1223 (10th Cir. 2021); *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1310–11 (11th Cir. 2022); *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 864–67

---

causation," we continued, "the Court reasoned [that] jurisdiction should not ride on the exact reasons for an individual plaintiff's [vehicle] purchase, or his ability to present persuasive evidence about them." *Id.* We concluded in *Yamashita* that all *Ford* meant to say when it held that "some relationships will support jurisdiction without a causal showing" was that jurisdiction can exist "over a class of cases for which causation seems particularly likely but is not always easy to prove." *Id.* We then in *Yamashita* applied *Ford*'s test for relatedness to examine the plaintiff's claims of causation and held that the district court did not err in dismissing for lack of personal jurisdiction when evidence of such causation was absent. *Id.* at 506–07.

(D.C. Cir. 2022).[7] And no circuit appears to have concluded otherwise.[8]

---

[7] The majority reads the Tenth Circuit's decision in *Hood v. American Auto Care, LLC* to "prove the opposite," i.e., that *Ford* does not require any causal connection between a defendant's activities and harms a plaintiff alleges arose from or were related to them. The majority again marshals a clause it can quote for support but misses the forest for the trees. While it is true that *Hood* read *Ford* to "ma[k]e clear that a causal connection is not required," 21 F.4th at 1222, it understood that causal analysis the same way the *Ford* Court did. As the *Hood* court explained just a few pages after the language the majority quotes, "*Ford* makes clear that specific jurisdiction is proper where a resident is injured by the very type of activity a nonresident directs at residents of the forum State—even if the activity that gave rise to the claim was not itself directed at the forum State." *Id.* at 1225.

[8] The majority ignores these cases (aside from *Hood*, which it overreads as noted above) and instead dials up *CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir. 1996), arguing "at least one other circuit … did not follow the rigid approach that Impossible X puts forth," i.e., requiring some nexus between a defendant's activities and suit-related harms. The majority understands the Sixth Circuit not to have required a strict showing of causality in a trademark declaratory judgment action where the defendant's only connection with the forum was marketing his software product exclusively on the plaintiff's server system. But even assuming the Sixth Circuit in 1996 somehow could have been applying that language as the Supreme Court used it in *Ford Motor Company* in 2021, what the court in *CompuServe* actually said was that

> CompuServe's declaratory judgment action arose in part because Patterson threatened, via regular mail and electronic mail, to seek an injunction against CompuServe's sales of its software product, or to seek damages at law if CompuServe did not pay to settle his purported claim. Thus, Patterson's threats—*which*

Lest the danger of discarding these real limits on the second-prong nexus analysis seem exaggerated, consider a hypothetical.  Assume a cordwainer based in Portland, Maine, owns a trademark over a line of tough waterproof boots he calls Portland Sea-Ment.  When he is not trimming a hide for a new pair of his boots, he spends long vacations at his second home in Hawaii trimming surf lines on a perpetual search for the perfect wave.  Partway through one such extended vacation, he pays an influencer to post TikToks of himself wearing the boots in the surf of Waikiki.  A couple weeks later, he Zooms from his lanai with a local REI manager to pitch his boots, but gets no traction because—so he is told—Hawaiians prefer flip-flops.  A month later, he boards his flight back to Maine sunned but bummed that his sporadic brand-building efforts in Hawaii failed to make waves.

Twelve hours into his return trip, his boredom rapidly mounting, he begins to page through a dogeared airline magazine only to discover to his horror an advertisement from a company in Portland, *Oregon*, that uses a mark shockingly similar to his own.  Upon landing, he immediately sends his west-coast nemesis a cease-and-desist letter.  The parties unsuccessfully try to negotiate a settlement at the Oregon company's headquarters, whereafter the Oregon company files a declaratory judgment action.

According to the theory the majority adopts today, the Oregon company could file its action in Hawaii and the

---

*were contacts with Ohio*—gave rise to the case before us.

89 F.3d at 1267 (emphasis added).  The Sixth Circuit's position does not create a circuit split.

Hawaii court couldn't boot the case—even though the only "enforcement" conduct giving rise to the Oregon company's declaratory judgment occurred in Oregon—because of the cordwainer-surfer's scattershot non-enforcement activities in Hawaii. Such a theory bids aloha to any semblance of "real limits" in analysis of the second *Schwarzenegger* prong.

\* \* \*

Instead of deciding this case consistent with how the parties litigated it below, the majority has created a novel jurisdictional rule that is either breathtaking in scope (if you rely on the majority's rationale) or hopelessly ambiguous (if you take seriously the majority's multiple disclaimers). There was no need for the majority to do that, because Impossible Foods affirmatively waived the specific argument now imposed by the majority. Even if it had not, none of those non-enforcement activities satisfies either the first or second *Schwarzenegger* jurisdictional prong. And because of those failures, Impossible Foods's arguments before us should amount to a nothingburger. The district court got it right, and its order should be affirmed.